## THE STATE v. THOMAS L. MARTIN, Appellant.

**Division Two, June 30, 1910.**

1. **FORGERY: Deed: Record as Evidence.** The deed alleged to have been forged by defendant must be produced at his trial, or its absence satisfactorily accounted for, before evidence can be given to prove the forgery; and if it is in defendant's hands, sufficient notice must be given him to produce it. And so where the State's witnesses testified that five days after the deed was recorded a woman, representing herself to be defendant's wife, called at his office for the deed, and took it away; and another witness testified that he called upon defendant at the jail and he stated the deed was in his possession, and he would turn it over to him if his lawyer said so; and no subpoena *duces tecum* was served on the wife to produce it, though about a year prior to the trial the officer twice called at her house to arrest her, but did not find her; and there is no evidence that the deed was lost or destroyed, and no notice was served on either defendant or his wife to produce it, the admission of a certified copy of the record of the deed in evidence was error.

2. ————: **Comparison of Signatures: Impeachment.** A witness on cross-examination should be permitted to testify that he compared the prosecutor's signature on a lost receipt—which defendant testified prosecutor gave him for a part payment for the house, to which it is charged defendant forged a deed—with prosecutor's admittedly genuine signature on a check, and what the witness's opinion was as to the two signatures being those of the same person. Such testimony might tend to strengthen defendant's defense, and it was proper cross-examination, and should not have been excluded as an attempt to impeach prosecutor. And the testimony was material because other witnesses testified that they saw defendant pay prosecutor the money and the prosecutor give him a receipt, and there was evidence both for the State and defendant that prosecutor had agreed to give defendant a deed for a partial payment and wait for the balance of the purchase money, and defendant testified that the deed had been executed.

3. ————: **Flight: Arrest: Breach of Bond: Ruse.** Where defendant had given bond and his case was continued until January, and he went off to Texas, and in October was arrested on a criminal charge, which was a ruse and instituted by his bondsmen who became uneasy lest he would "jump his bond," evidence of his

going to Texas and of his arrest there, and of his being brought back and lodged in jail, was error. The arrest was premature, and did not tend to establish the prior charge of forgery.

4. **EVIDENCE: Erroneous: Cured by Instruction.** An instruction directing the jury to disregard evidence improperly admitted in a criminal case will not cure the error of admitting it, if it was of a character prejudicial to defendant.

5. ———: **Change of Venue.** It is error to permit the prosecuting attorney to ask defendant if he had not taken a change of venue in the case on trial.

6. ———: **In Criminal Cases.** As life, liberty and reputation are more valuable than property, the rules of evidence should be more carefully observed in criminal than in civil cases.

Appeal from Jackson Criminal Court.—*Hon. E. E. Porterfield,* Judge.

REVERSED AND REMANDED.

*Noyes & Heath* for appellant.

(1) The court erred in sustaining the objection to the evidence of witness Webb, as to the receipt for $500. Strange v. Crowley, 91 Mo. 287; Kleimann v. Giselmann, 114 Mo. 437. (2) The court erred in permitting the evidence of Langsdale, Reynold, Murphy and Lee, as to the defendant being arrested in Texas and as to other charges against him. R. S. 1899, sec. 4680. (3) The court erred in permitting the State to cross-examine the defendant on matters not mentioned in direct examination. State v. Patterson, 88 Mo. 88; State v. Chamberlain, 89 Mo. 129; R. S. 1899, sec. 2637; State v. Fullerton, 90 Mo. App. 417; State v. Tract, 36 Mo. App. 29. (4) The court erred in permitting the State to introduce a certified copy of the deed. Pringey v. Guss, 16 Okla. 82; State v. Lentz, 184 Mo. 223; State v. Flanders, 118 Mo. 227; State v. Teasdale, 120 Mo. App. 692; Carr v. Carr, 36 Mo. 408. (5) The court erred in permitting the examination of the defendant on the change of venue and application for continuance. McDonald v. Cash, 45 Mo. App. 66; Wall v. State, 62 S. W. 1062.

*Elliott W. Major,* Attorney-General, and *John M. Dawson,* Assistant Attorney-General, for the State.

(1) Defendant objected to the introduction of the two deeds of trust upon the property, because they were transactions after the fact. These deeds of trust were competent for the purpose of showing that defendant was claiming the property under the forged deed, and was exercising rights of ownership by executing mortgages upon the property. (2) Defendant inquired of witness W. S. Webb if he examined the receipt for five hundred dollars from Thomas L. Martin, and signed by Anton Mielkey, at a trial in Judge Seehorn's court, involving this same property described in the forged deed, and if the signature to the receipt was written by the same man as the signature on the check and note. The State objected to this evidence on the ground that it was a matter of impeachment, and no foundation was laid for the impeachment. As Mr. Mielkey had not been interrogated upon that question, this was a proper ruling. (3) The defendant excepted to the action of the State showing that it was impossible to subpoena Lotta Martin, the wife of the defendant, at the trial of this cause, to bring forth the purported forged deed that she obtained from the recorder's office. This was competent evidence. (4) The exception to the State proving that the appellant was extradited and brought from Texas to this State for trial, could not be considered, as the court, in instruction 5, instructed the jury that defendant's arrest in Texas raised no presumption as to his guilt, and the jury were instructed to disregard it in making up their verdict. (5) Objection is made that testimony was introduced that the officers of the court were unable to find Mrs. Martin, wife of appellant. It was obligatory upon the State to produce the deed. In case of loss or destruction of same the certified copy was admissible in evidence. It was so held in State v. Flanders, 118 Mo. 237. 2 Bishop's Crim. Proc. (3 Ed.), sec. 433. The

witness in the recorder's office testified that a woman, who gave her name as Mrs. Martin, had taken the deed from the office. It was proper for the State to show the loss of the deed and thus make out a prima-facie case of its loss before introducing certified copy. State v. Flanders, supra, 238; Foulkes v. Common. wealth, 2 Rob. (Va.) 836; Rex v. Haworth, 4 C. & P. 254; United States v. Britton, 2 Mason 464; Henderson v. State, 14 Tex. 503.

FOX, J.—By information filed by the prosecuting attorney of Jackson county in the criminal court thereof, the defendant was charged with having, on the 4th day of April, 1907, forged a certain deed, purporting to be the act of one Anton Mielkey, conveying to himself (defendant) said Mielkey's interest in certain real property in Kansas City, Jackson county, Missouri, with intent to defraud. He was convicted of said offense, his punishment being assessed at ten years in the penitentiary. From the judgment of conviction defendant appealed to this court.

The evidence on behalf of the State tended to prove that Anton Mielkey lived at 807 Linwood boulevard, Kansas City, Missouri, and was since 1882 owner of the real estate in said city, the deed to which defendant is charged with having forged. Defendant and his wife, Lotta Martin, lived at 3215 Smart avenue, in Kansas City. Mielkey became acquainted with the defendant through the latter's wife, who had been dressmaker for Mielkey's wife, and who often visited at his house. It appears that on August 1, 1906, Mielkey conveyed this property by warranty deed to Mrs. Martin, and that several days thereafter Mrs. Martin and her husband, the defendant, re-conveyed the same to Mielkey. As to this transaction Mielkey testified that Mrs. Martin was to hold the property for the Bank of Commerce, and that he had no trouble in getting it back. On Christmas day, 1906, defendant went to Mielkey's

home and presented him with a box of cigars and a scarf, the latter being a present from defendant's mother-in-law. Thereafter, about the latter part of January, 1907, Mielkey was at Martin's home, and while there he made it known that he wished to sell his Linwood boulevard home, having need of money. Mrs. Martin said that she knew Mr. Winants, of the Bank of Commerce, very well; that the Bank of Commerce "had now a building and loan company in connection with its banking business," and that if Mielkey would allow her to take his abstract over to the bank, she would ask Mr. Winants to buy his property before buying any other real estate. To this Mr. Mielkey replied: "I will allow you to take the abstract over, but I will not give a deed until I get my money." This conversation was carried on in the presence of the defendant. The abstract in question was afterwards placed in the Bank of Commerce, and in the latter part of March, 1907, Mielkey delivered the abstract to defendant to have the same examined by a man named Brown, who was in some way to procure money for Martin to enable him to purchase the property, the price to be five thousand dollars. On March 21, 1907, Mielkey received from Martin a short letter, reading as follows: "Come over your earliest convenience, Saturday or Sunday, for supper. Want to see you on important business." A few days later Mielkey received another letter from Martin, which letter became lost, but the contents of which, as Mielkey remembered same, were as follows: "Your property is sold for cash, on your approval. Meet me to-morrow at eleven o'clock at Brown's office." Instead of going to Brown's office, Mielkey went next day to Martin's house, and played cards with Martin till about 9 o'clock that evening, when he departed for home. Defendant accompanied him to the car line. On the way defendant told Mielkey that he had made arrangements with Brown, who represented an Eastern insurance company, whereby

he (Martin) could get money to purchase Mielkey's property; also, that he had received a letter from a friend in the East who had money, and who asked him to look up some good investment. Martin then informed him that he was going to buy this property and build a flat thereon, and then sell the same to his Eastern friend, and make some money by the transaction. He did not give the name of his friend, but stated that he had known him for years, and was raised with him. Some days later Mielkey received from Martin the following undated letter: "Bring the deed when you bring the abstract. Mr. Brown suggests that if you had the deed in the abstract it would do away with a lot of red tape; could get the money right away. This is merely a suggestion. He and I went out and looked over the property this morning." After receiving said letter Mielkey called at defendant's home, and again engaged in a game of cards with defendant. Nothing appears to have been said by either, respecting the contemplated transaction, during the progress of the card game. As Mielkey was about to leave Martin's house Martin volunteered to go with him to the car line. While on the way to the car line Mielkey told defendant that the abstract was at the Bank of Commerce, and that he, defendant, would have to get it. Next morning defendant brought the abstract to Mielkey, who delivered it to the Dean S. Kelly Abstract Company in order that the abstract might show all transfers of the property down to date. He received the abstract from said company about the 4th or 5th of April, 1907, and took the same, together with the deed which Mielkey had received from Charles E. Welke, from whom he had purchased the property, to Martin's house. Martin met him at the door and took him into the house the back way. After remaining awhile in the house, defendant took Mielkey down in the basement, where defendant asked him for and received the abstract. On the way to the car line, defendant said he would have the money

229 Sup—40

State v. Martin.

in a few days, Mielkey replying, "All right; then we will have it all straightened up." Mielkey explained that the reason defendant took him down in the basement was that the house was being painted, as also the porch, and to avoid the paint they went down in the basement and out through a side door. Next day Martin came to Mielkey's house and informed him that Brown said that if he (Mielkey) would deed the property to him (Martin), it would do away with a great deal of red tape, and the money would be forthcoming promptly. Mielkey replied that he would not give the deed until the money was ready to be given him, and told Martin to see Brown about it again. On April 8th or 9th, 1907, Mielkey received an undated letter from Martin, the envelope containing it being postmarked, "Kansas City, Mo., Apr. 8-8:30 p. m., '07." Said letter contained the following:

. Mr. Brown says that he can't handle the proposition in any other way. He says that he could not get the money without sending to the home office. He says it is simply a matter of your trusting the property in my name for a few days. He says he can't understand why you would trust a transfer only a few months ago, and to the same parties, and not now. He says that he will pay for all trouble if he fails to put the deal through. He says that he will guarantee to put the trade through. Now, Mr. Mielkey, I have told you all that Brown says. Now, if you have enough confidence in my honesty (you know that I would not do you any wrong), I can pay you for the property and make some money. There is no difference in this trade than the one when you made the deed to Lottie. Only this, this proposition will go through. If it should fall through, the deed will be returned and your troubles paid for the expense of the abstract, as the deed won't be recorded, there will be no harm done.

Your friend,

T. L. MARTIN.

I am to let him know tomorrow; if you accept, meet me Tuesday at Fidelity Trust Company at 11 o'clock a. m.

We can do this if you care to make the trade, you can execute deed and take a mortgage for $5000, neither paper to be recorded. When you receive the money you can give me the mortgage as you know the purchase money mortgage don't have to be filed to hold priority.

Don't you think that this plan protects you till you get the money? This way you run no risk.

The morning after Mielkey received said letter defendant went to the home of Mielkey and said to him, "I don't want no deed. I have made arrangements with Mr. Brown to get the money on my life insurance policy." Mielkey said, "Are you sure you can get it?" Defendant said, "Yes, it will be about ten days though; the papers have to go East for approval." He also said to Mielkey, "Don't tell my wife anything; you know that women are so bothersome. After I have it bought, and the plans all made, I will surprise my wife with the plan of the building I am going to put up." Mielkey went to defendant's home the following Sunday, had dinner there, and played cards with defendant. The latter accompanied Mielkey to the car line, and told him to call the latter part of the week, which Mielkey did, but found no one at home save Mrs. Dilks, defendant's mother-in-law. Mielkey again called at defendant's home the following Monday, when Martin and his wife told him that they had been in St. Louis, attending the funeral of a dead friend or relative. Defendant also told him at that time that the papers had arrived from the East, but that there was a flaw in same and they had to be returned to be rectified. On the 8th or 9th day of May, 1907, Mielkey received from defendant a postal card, saying: "Meet me at Fidelity Trust Co. Tuesday, at 2 p. m., or Wednesday, at 11 a. m." The postal card was postmarked "Kansas City, Mo., May 7, 3 a. m., 1907." Mielkey did not meet defendant at the appointed place, but went to defendant's home, where he and defendant played cards. Defendant told him that evening that he could not get the money from Brown; that Brown had let down on him, and that he, Martin, had made arrangements with his uncle, living in the East, whereby said uncle was to let him have $1500. Defendant asked Mielkey if that would be enough, Mielkey replying that that would be enough to help him out, and that he could take the balance in notes. On the 10th day of May

Mielkey went to the city hall to pay his special taxes, and discovered that the taxes on his Linwood boulevard home had already been paid by the Missouri Savings Association. He then went to the office of the recorder of deeds, where he found the record of a deed purporting to be from him to the defendant, conveying to defendant Mielkey's Linwood boulevard property, said deed being as follows:

This Indenture, made on the fourth day of April A. D. one thousand nine hundred and seven, by and between Anton Mielkey, of the county of Jackson, State of Missouri, party of the first part, and Thomas L. Martin, of the county of Jackson, State of Missouri, party of the second part,

Witnesseth, That the said party of the first part, in consideration of the sum of five thousand dollars to him paid by said party of the second part (the receipt of which is hereby acknowledged) do by these presents grant, bargain and sell, convey and confirm unto the said party of the second part,——— heirs and assigns, the following described lots, tracts or parcels of land, lying, being and situate in the county of Jackson, and State of Missouri, to-wit: All of that part of the northeast ¼ of the southeast ¼ of section 17, township 49, range 33, described as follows:

Beginning at a *part* on the south line of Linwood Boulevard in Kansas City, Missouri, 237 feet east of the west line of the said northeast ¼ of southeast ¼, thence east along the south line of said Linwood Boulevard 60 feet; thence south 125 feet; thence west 60 feet; thence north 125 feet to point of beginning in Kansas City, Missouri..

To Have and to Hold the premises aforesaid, with all and singular the rights, privileges, appurtenances and immunities thereto belonging or in anywise appertaining unto the said party of the second part and unto his heirs and assigns forever; the said party of the first part hereby covenanting that he has lawfully seized of an indefeasible estate in fee of the premises herein conveyed; that he has good right to convey the same; that the said premises are free and clear from any incumbrance done or suffered by him or those under whom he claims; and that the party of the first part will warrant and defend the title to the said premises unto the said party of the second part and unto his heirs and assigns forever, against the lawful claims and demands of all persons whomsoever.

In Witness Whereof, The said party of the first part has hereunto set his hand and seal the day and year above written.

·(Seal)    ANTON MIELKEY.

According to the record, the deed was acknowledged on the 4th day of April, 1907, before Harry E. Longenecker, a notary public. The filing for record was on the 10th day of April, 1907.

Mielkey denied that he ever gave defendant any such deed as he saw on the record, and a certified copy of which was introduced in evidence. On the evening of the 10th of May Mielkey called at Martin's house, where they again played cards. Defendant accompanied Mielkey to the car line, and before separating Mielkey said: "Oh, say; I was up to the city hall and I wanted to pay my taxes, and found they were already paid. I wonder whether I had better look up by whom they were paid." Defendant answered: "No, don't do that; if they are paid it is so much the better for both of us." Next day Mielkey had his attorneys examine the records, and on their advice he went to the prosecuting attorney, swore out a complaint, and had defendant arrested.

Harry E. Longenecker, notary public, testified that he never took the acknowledgment to the deed in question; that he was acquainted with the defendant, but not with Mielkey; that the defendant had been in his office a few times, and was there once while he was out; that he kept his notarial seal in a pigeon-hole of his roller-top desk, and in view of anybody who might be in his office when the desk was open. Mielkey testified that he never made, signed, or acknowledged said deed.

The evidence shows that on April 13, 1907, defendant borrowed $1200 from the Missouri Savings Association, payable on the 1st day of May, 1908, to secure which loan he gave the Association a deed of trust on the property mentioned in the deed in question, and acknowledged same as a single person before John F. Wade, a notary public, which deed of trust was filed for record April 15, 1907; that afterwards, on May 10, 1907, he gave said Association another deed of trust on said property to secure the payment of another loan

of $1800, which deed of trust was acknowledged by defendant as a single person, the same day, before J. T. Allbritain, a notary public, and filed for record on May 11, 1907. This latter loan, according to the testimony, included the former loan; that is to say, the first loan of $1200 was increased to $1800, and a new deed of trust, that of May 10th, was given by defendant to secure the payment of same.

Claude S. Gossett, who was connected with the office of recorder of deeds of Jackson county, testified for the State that on April 15, 1907, the deed purporting to be from Anton Mielkey to Thomas L. Martin, and which had been recorded on April 10, 1907, was delivered by him to a woman who gave her name as Mrs. Lotta Martin; that about sixty days afterwards, ''at a preliminary hearing of some kind in Judge Remley's court,'' Mrs. Martin being present, he was asked if she was the woman who got the deed from him, and his reply was, ''To the best of my judgment she was the woman that got the deed.'' The witness, however, ''could not say positively she was the woman.''

The evidence for the defendant tended to prove that the defendant was in St. Louis from the 16th until the 21st of April, 1907, and that his wife, Mrs. Martin, was in St. Louis from the 12th to the 22nd of April, 1907, and that she was not the woman who took the deed in question from the recorder's office on April 15, 1907.

J. W. McCann, a witness for defendant, testified that he was with Mielkey and the defendant in a bank building in Kansas City on April 22, 1907, at which time and place he saw Mielkey write a receipt on a small piece of paper and give it to defendant, and saw defendant give Mielkey five hundred dollars in large bills; that Mielkey and defendant talked for some time; that the former wanted to know when he could get more money, when Martin said he (Mielkey) could have a

thousand dollars in about a month, and then said he would have it in June.

John R. McMillan, testifying for the defendant, stated that he was at defendant's house on the 7th, 8th or 9th of May, 1907, when Mr. Mielkey was present; that he overheard a conversation between Mielkey and the defendant, in which Mielkey said to Martin that "he had to have five hundred dollars more," and that Martin "agreed to get it for him as soon as he could." The witness did not know anything about the transaction, except that it was about a piece of property.

The defendant testified that he was in the grain business in Kansas City, and had been connected with Richards & Company, of Chicago, and the Benton Grain Company, and F. R. Linton. He had known Mielkey for four or five years, and since the 21st of March, 1907, Mielkey had been a visitor at his house two or three times a week. He never visited Mielkey's home, but his wife did. That Mielkey delivered the deed in question to him in the basement of his house on the 5th, 6th or 7th of April, 1907, and that the signature to said deed was Mielkey's signature. Defendant took the deed to the recorder's office, and paid 85 cents to have it recorded, and had not seen the deed since then. He was to pay Mielkey $5000 for the property, upon which he intended to erect a three or four compartment flat, Mielkey to be paid his money during the course of the erection of said flat, fifteen hundred dollars to be paid before the first day of June; that he paid Mielkey five hundred dollars on the 22d of April, 1907, at the Fidelity Trust Company, Mr. McCann and Mr. Allen being present when he paid said sum. The money for the payment of the purchase price of the property was to be procured from or through a Mr. Tabibian, a loan and insurance man, and defendant had also talked to Mr. Van Landingham, of the State Life Insurance Company, and with the representative of the Corn Belt Bank. Mielkey gave

him a receipt for the $500 paid him, but the receipt became lost in Judge Seehorn's court during the trial of a civil case, and he had not seen it since; that he (defendant) was a prisoner at that time. After he paid the first five hundred dollars to Mielkey, the latter told him that he was indebted to Barber & Barber for $1800, and would have to make payments in June and July, and needed money; that Mr. Tabibian was sick at the time, and negotiations were hanging fire awaiting his recovery. He wrote Mielkey a postal card, and Mielkey called at his house and told him he must have more money; that he told Mielkey he could get him some money in two or three days; that he borrowed six hundred dollars more from the Missouri Savings Association on the 11th of May, and was arrested three hours afterwards. He wrote Mielkey seven or eight letters about the transaction, and the object which he had in view in writing the letter of May 8th was to consult with Mielkey about a loan from the Missouri Savings Association. After he received the deed, Mielkey ordered the tenants occupying the property to move, so that he (defendant) could take possession. In his letter to Mielkey he meant by the expression as to "having the deed in the abstract" that he wished the deed from Mielkey to him to be embraced in the abstract; that he desired this done so that Mr. Tabibian would have no trouble in arriving at a conclusion as to who owned the property. His wife went to St. Louis on April 12th and did not return until April 22d, and he went to St. Louis on April 16th, and returned to Kansas City with his wife. He went to Wichita, Kansas, and to Oklahoma and Texas for the purpose of borrowing money, and had no idea of running away.

On cross-examination the defendant testified that the agreement between him and Mielkey was that he (defendant) was to erect a flat on the property at 807 Linwood boulevard, and pay Mielkey $5000 for the property out of money he was to borrow to erect the

flat; that he was to borrow $17,000 from Mr. Tabibian for this purpose. He did not pay Mielkey a penny at the time the deed was delivered, but was to pay him out of the money he intended to borrow to erect the flat which was to cost $12,000. That Mielkey understood and agreed to the deal; that the arrangement for the money had been made with Mr. Tabibian, and that defendant was to draw on Tabibian as he needed the money in the erection of the flat; that the agreement between him and Tabibian had never been reduced to writing; Tabibian was to be secured by a deed of trust on the property and flat. No agreement had been made with Tabibian as to the amount the latter would advance at any one time. No plans for the building had been drawn because Tabibian was taken sick, and the tenants on the property would not get out until May 9th. The whole arrangement fell through because Mr. Tabibian died and he (defendant) was arrested on May 11th. Defendant testified that he paid $375 taxes due on the property and paid Mielkey $500. In the agreement with Mielkey, the latter was to have no security, but was willing to trust the defendant for the purchase money. Defendant wrote Mielkey a letter in which he told him that if he wanted a deed of trust he (defendant) would make a deed of trust, but that if he did so, then he could not execute another to Mr. Tabibian; that his reason for not telling Mr. Mielkey about Mr. Tabibian was that the latter did not want his name used; that Tabibian told him that the money was coming through a Mr. Brown, but he did not know who Brown was at first; that he learned that Mr. Brown of Brown & Gilmore was the gentleman through whom Tabibian was handling the matter. Defendant testified that the reason why he signed the deeds of trust to the Missouri Savings Association as a single man was that he did not wish to have his wife know anything about the transaction; that neither of the notaries public asked him whether he was married or sin-

gle.  He further testified that he never took Mielkey's deed to him from the recorder's office, nor authorized any one to do so, and did not know who had taken it from said office; that out of the first loan from the Missouri Savings Association, which was seven hundred and forty dollars, he paid the taxes on the property, and paid Mielkey five hundred dollars; that out of the second loan he intended to pay Mielkey five hundred dollars, but was arrested three hours afterwards, and did not pay it.

W. M. Burgess, testifying for the State in rebuttal, stated that he was connected with the Missouri Savings Association; that about the time defendant made application for the second loan, he asked him what he had done with the money he received on the first loan, and that defendant said "he got a few drinks too many, and his wife took the money away from him."

C. E. Kimpton, a lawyer, testified in rebuttal that he saw the defendant in the jail after his arrest, and that in a conversation had with him with reference to the deed in question defendant told him that the deed was "crooked," and that it "was in his possession;" that he (witness) was counsel for Mielkey at the time, and that he went to see the defendant in order to get from him the deed which he believed was forged; that the defendant also told him that he would turn the deed over to him if his lawyer said so.

The State offered other evidence in rebuttal tending to show that the defendant and his wife were in Kansas City on April 16, 1907, and that defendant's wife was at home on the 14th, 15th and 16th, of April, 1907, and left Kansas City on the afternoon of April 16th.

## OPINION.

### I.

There are no objections to the information or to the instructions of the court, and nearly all the assign-

ments of error relate to the introduction of improper testimony. The errors assigned are very numerous, but we will give consideration to such only as appear to us to be well founded.

## II.

It is urged by defendant that the court erred in permitting the State to introduce in evidence a certified copy of the alleged forged deed, proper grounds for the introduction of such secondary evidence not having been laid.

Needless to say, the deed itself was the best evidence, and it was incumbent upon the State to produce the best evidence obtainable. "The forged instrument must be produced and put in evidence before evidence of the forgery will be admitted at the trial, or its non-production be justified from necessity, as by showing that it is lost or destroyed, or not within reach of the process of the court, or is in the possession of the defendant. And in the last instance, not in the others, reasonable notice must have been given him to produce it." [ 2 Bish. New Crim. Proc., sec. 433; State v. Flanders, 118 Mo. 227.] There is no evidence that the instrument was lost or destroyed, nor is it shown that the defendant was notified to produce it. Although there was evidence tending to show that Mrs. Lotta Martin, or a woman who gave that as her name, took the deed from the recorder's office on April 15, 1907, it does not appear that Mrs. Martin had ever been served with a subpoena *duces tecum*, or that such had ever been issued. A warrant for her arrest was issued and placed in the hands of the marshal, who made two trips to her house, but failed to find her there. This, however, was about a year before the trial. No further effort had been made to find her since that time.

It is not shown that she was not within the jurisdiction of the court at the time of the trial. While the defendant testified that he had not seen the deed since the time he took it to the recorder's office, one of the State's witnesses, C. E. Kimpton, testified that the defendant, after his arrest, told him that the deed was in his possession and that he (defendant) could get it. Despite this evidence on the part of the State, no notice was served on the defendant to produce the deed. The authorities all agree that the instrument alleged to be forged must be produced at the trial, or its absence satisfactorily accounted for, before evidence can be given to prove the forgery, and that if the instrument is in the hands of the accused, sufficient notice must be given him to produce it. Mr. Greenleaf says: "When the instrument or writing is in the hands or power of the adverse party, there are, in general, . . . no means at law of compelling him to produce it; but the practice in such cases is to give him or his attorney a regular notice to produce the original; not that on proof of such notice, he is compellable to give evidence against himself, but to lay a foundation for the introduction of secondary evidence of the contents of the document or writing, by showing that the party has done all in his power to produce the original." [1 Greenl. on Ev. (5 Ed.), sec. 560.] Under our statute (Sec. 933, R. S. 1899), before a certified copy of an instrument of writing, conveying or affecting real estate, can be read in evidence, "it shall be shown to the court by the oath or affidavit of the party wishing to use the same, or of anyone knowing the fact, that such instrument is lost, or not within the power of the party wishing to use the same." [State v. Burlingame, 146 Mo. 207.] This requirement of the statute was not complied with before the certified copy of the instrument was read in evidence, and this being the fact, the court erred in permitting the introduction of said secondary evidence. The defendant testified that the

deed was genuine; that it was made and delivered to him by Mielkey, and that he had it recorded. Mielkey denied that he made or delivered any such deed. The production of the deed, and a comparison of handwritings, would have settled the issue of veracity and disclosed the guilt or innocence of the defendant. Proper diligence was not exercised by the State to secure the original deed and produce it at the trial.

### III.

Defendant insists that the court erred in sustaining objections to the evidence of W. S. Webb, a witness for the State, as to the signature to a certain receipt for $500 which defendant claimed Mielkey gave him at the offices of the Fidelity Trust Company on April 22, 1907. McCann, a witness for defendant, testified that on said date he saw defendant pay Mielkey five hundred dollars and saw Mielkey give him a receipt. Defendant testified that in a civil suit growing out of the same transaction, and tried in Judge Seehorn's court, witness Webb compared the signature to this receipt with Mielkey's signatures to a certain check and note produced at said trial. Mielkey testified that he had not seen any of said papers since they were produced in Judge Seehorn's court, and did not know what had become of them.

This question was asked witness Webb: "Did you compare the signature of Anton Mielkey on this receipt to the signature of his on his notes and checks?" Answer, "Yes, sir." Then this question was propounded to him: "Was the signature on this receipt written by the same man that the signature on the check and note was?" The prosecuting attorney objected to the question on the ground that it was "matter of impeachment for which no foundation was laid," and the court sustained the objection. Thereupon defendant's counsel said to the court: "I desire to prove by this witness that he examined, as an expert, the receipt in

State v. Martin.

question, which was a receipt for five hundred dollars from Anton Mielkey to Thomas L. Martin; that he examined the checks and notes made by Mr. Mielkey to different parties, and the signature on this receipt was the same—written by the same man—the same handwriting as the signature on the notes and checks admitted by Mr. Mielkey to be his signature." Notwithstanding this statement as to what the defendant intended to prove by the witness, the court would not allow the question to be put, the defendant excepting to the court's ruling. Evidently the testimony sought to be elicited was not for the purpose of impeachment, as Mielkey had not been asked whether he gave defendant such receipt. We think the court should have permitted the witness to answer the question. Should the answer be in the negative, the defendant would be the sufferer. If in the affirmative, it would tend to corroborate McCann's and defendant's testimony that Mielkey gave the receipt in question to the defendant, and thus strengthen his defense. As the receipt and other papers referred to were lost, it was competent for the witness to say from his recollection of the signatures thereon whether they were those of the same person, although his testimony would not be of as great value as if the papers were before the court. All the evidence was of a secondary or circumstantial character, and we think this testimony should have been admitted. The witness had given some damaging testimony against the defendant, and the latter had the right to cross-examine him fully. "A party to a cause, civil or criminal, against whom a witness has been called and given some evidence, shall be entitled to cross-examine said witness (except where a defendant in a criminal case is testifying in his own behalf) on the entire case." [Sec. 4655a, Laws 1905, p. 307.] As said by this court in State v. O'Connor, 105 Mo. l. c. 125, "the right of cross-examination must be maintained, or trials will become mockeries, shams, pretenses."

## IV.

Complaint is made of the court's action in admitting evidence tending to prove that the defendant had been arrested in Texas and brought back to Missouri for trial, there being no evidence that the defendant had fled the State for the purpose of avoiding trial.

It appears from the evidence that after defendant's arrest on May 11, 1907, on the charge of forgery, he was admitted to bail. The sureties on his bail bond saw him frequently in Kansas City for several months afterwards. In the month of October, 1907, they were unable to locate him, and one of his bondsmen filed a charge of some sort against him in the criminal court of Jackson county, and a warrant was issued for his arrest. He was located in Houston, Texas, and a detective was sent there to arrest and bring him to this State. While in Texas, defendant wrote one of his bondsmen a letter which the former sought to have introduced in evidence, but which, upon objection of the prosecuting attorney, was excluded. Defendant was never tried on the charge pending against him in said criminal court, and it was never set for hearing. He testified that he had endeavored to have the case tried and disposed of, and that the assistant prosecuting attorney informed him more than three times that the case would be called and dismissed. The record shows that on June 28, 1907, the case at bar, on application of the defendant, was continued to the next succeeding term, begun on the first Monday in January, 1908, the same being the sixth day of said month. If the object of defendant's arrest and extradition in November, 1907, was to compel his attendance at the trial of this case, certainly the arrest was premature, the case having been continued until the January term. He had been admitted to bail, and was free to go where he chose in the interim. It appears from the record that the case was continued several times, and the evidence is that the defendant was present

every time it was called for hearing. One of defendant's bondsmen testified that he was afraid defendant "had jumped his bond," and the other testified that he was "a little nervous" about the bond. From the testimony the inference is entirely justifiable that the charge filed against the defendant in the criminal court was a ruse upon the part of the bondsmen to prevent forfeiture of the bail bond by having the defendant arrested and extradited under said charge.

It is quite clear that all this evidence about the defendant's arrest and extradition was incompetent, and was bound to prejudice his case before the jury. The prosecuting attorney, in the hearing of the jury, said, "I want to show that he [defendant] had to be extradited and brought back for trial," and he certainly did endeavor to prove that such was the fact. While, at the instance of defendant, the court instructed the jury that the evidence as to defendant's arrest in the State of Texas raised no presumption as to his guilt, and that they should disregard it in making up their verdict, we are far from believing that said instruction cured the error. It has been frequently ruled by this court that an instruction to disregard evidence improperly admitted in a criminal case will not cure the error of admitting it, if it was of a character prejudicial to the defendant. [State v. Mix, 15 Mo. 153; State v. Hopper, 71 Mo. 425; State v. Fredericks, 85 Mo. 145; State v. Kuehner, 93 Mo. 193; State v. Thomas, 99 Mo. 235; State v. Spivey, 191 Mo. 87; State v. Minor, 193 Mo. 597.] As said in the Minor case, supra, "the greatest care should be taken by court and counsel to prevent the introduction of illegal evidence, since, when it is once lodged in the minds of the jury, no one can tell its effect."

## V.

Defendant also complains of the court's action in permitting counsel for the State, over defendant's objection, to ask defendant if he had not taken a change of venue in this case. We think such question was highly improper and prejudicial. The matter of defendant's taking a change of venue was not for the consideration of the jury, and the question could have no effect other than to create in the minds of the jury an impression inimical to the defendant. [McDonald & Co. v. Cash, 45 Mo. App. 66; Wall v. State, 62 S. W. 1062.]

A careful reading of the bill of exceptions in this case forces the conclusion that the rules of evidence were by no means strictly observed by the prosecution. As life, liberty and reputation are of more value than property, the rules of evidence should be more carefully observed in criminal than in civil cases. The conviction and punishment of a person unfortunate enough to be charged with crime should only follow a fair and impartial trial, and after his guilt is established beyond all reasonable doubt.

We have considered only the more important points made by the defendant. The objections to the evidence and the exceptions to the rulings of the court thereon are so numerous as to preclude consideration of them all.

For the errors pointed out the judgment is reversed and the cause remanded for new trial. All concur.