STATE of Missouri, Respondent,

v.

Hubert FULKERSON, Appellant.

No. 47275.

Supreme Court of Missouri,

Division No. 2.

Jan. 11, 1960.

Motion for Rehearing or to Transfer to
Court en Banc Denied Feb. 8, 1960.

---

A. Camp Bonds, Muskogee, Okl., John W. Newhart, Savannah, for appellant.

John M. Dalton, Atty. Gen., W. H. Bates, Sp. Asst. Atty. Gen., for respondent.

STOCKARD, Commissioner.

In this circumstantial evidence case Hubert Fulkerson (hereafter referred to as defendant) was found guilty of administering arsenic poison to Mrs. Luella Matthews with the intent to kill or injure her (see Section 559.150 RSMo 1949, V.A.M.S., as amended, Laws of Missouri 1955, p. 504), and sentenced to confinement in the penitentiary for a term of seven years. He has appealed from the judgment entered in conformity with the jury verdict.

Defendant was a student at Park College, Parkville, Missouri, where he worked part time in the college Health Center under the direction and supervision of Mrs. Matthews. Although defendant usually worked at the Health Center on afternoons, he reported for work about 7:30 o'clock on the morning of May 9, 1957. He swept and waxed floors until shortly before 9:00 o'clock when he left to go to the second floor of the science building for a 9:10 o'clock appointment with his faculty counselor. Defendant stated that his meeting with his counselor lasted about twenty minutes and that he then went back to his room in the dormitory. At 11:00 o'clock he returned to the Health Center and finished cleaning and waxing floors. He then raked leaves around the south end of the building. Although her reason for doing so does not appear in the record, Mrs. Matthews searched defendant's suede jacket, which was hanging in a closet in the kitchen, and she found in one of the pockets a glass bottle containing a reddish powder and labeled arsenic sulphide, but which was later determined to be arsenic pentasulphide. Mrs. Matthews immediately notified Mr. Alexander Patience, the acting dean of men, who took a sample of the contents of the bottle and then replaced the bottle in defendant's jacket.

Miss Shirley Flint (Mrs. Jury at time of trial), a student who worked as a cook at the Health Center, arrived at about 11:05 o'clock to prepare the noon meal which consisted of a ham and potato cake, fruit salad, milk and bran muffins. In the preparation of the muffins she placed the bran, milk, eggs and shortening in a bowl and started to mix them by use of an electric mixer. While they were being mixed, Miss Flint was working at a nearby table and defendant "came up behind" her and she bumped into him when she turned around. She did not know how long he had been there. The implication is that when defendant was behind Miss Flint he was next to the electric mixer. Afterward, when Miss Flint took the mixing bowl to add the flour, baking powder and "other ingredients" she "noticed that there was a little bit of some white substance around the edge where it hadn't been completely mixed." However, she went ahead and prepared the muffins. Miss Flint and defendant were the only ones nearby while the muffins were being mixed. After the muffins were baked, defendant entered the kitchen again and took one of the muffins and buttered it. According to defendant he ate the muffin, but Miss Flint only saw him take one bite, and she could not say whether or not he ate it. About noon Mrs. Matthews, Miss Flint and Mrs. Markley ate lunch, and the food was also served to a student named John Porter who was a patient in the Health Center. All except Mrs. Markley, who was on a diet, ate one or more of the muffins, and all except Mrs. Markley shortly thereafter became violently ill with pronounced symptoms of arsenic poisoning. Medical aid was obtained and emergency treatment was administered. Dr. H. C. Thurman, the treat-

ing physician, stated that Mrs. Matthews was "quite ill."

Part of a muffin was analyzed chemically and arsenic was found to be present. An analysis of specimens of vomit and urine of Mrs. Matthews disclosed the presence of arsenic. Dr. Thurman stated that the amount of arsenic estimated by the chemists to be in a muffin would be extremely poisonous. The other food served at the lunch was tested but no evidence of arsenic was there found.

Defendant had left the Health Center before the muffins were eaten, and for some reason not disclosed by the record, Dean Patience had arranged for a student by the name of Kenneth Grady to "surveil or follow" him. Grady first "picked up" the defendant on this surveillance about noon of May 9 when he left the Health Center. He was then carrying his jacket, and he went to the "Commons" and ate lunch in the student dining room. According to Marylin Johnston, a student who also worked at the Health Center of afternoons, she and defendant met on the campus about noon while he was walking from the direction of the Health Center toward the "Commons." They exchanged greetings and in the conversation defendant asked her "twice and perhaps three times" if she intended to eat lunch at the Health Center. Defendant admitted he was acquainted with Marylin Johnston but denied this encounter, and Kenneth Grady who was then following defendant was not asked about it.

According to defendant, before he finished his lunch at the "Commons" he became ill and went to the rest-room and vomited, but Grady did not see him do this. Grady stated that after lunch defendant went to the "J. R.," the student union portion of the "Commons," and after "roaming around" he left the building. He then made a short visit to the administration building (defendant said he was checking his mail box), and then went to Copely Hall, the dormitory where he lived. Defendant testified that as he neared Copely Hall "I stuck my

hand in my pocket and I found a *vile,* a clear glass bottle about five inches long with a black cap and labeled arsenic pentasulphide [it was actually labeled arsenic sulphide but contained arsenic pentasulphide] * * * but I have no idea about where it came from. * * * To the best of my knowledge it wasn't there [Health Center] at all * * * [but] could have been." He knew that if a student "removed something from the chemistry lab you flunked-failed," and "I tried to think where it come from and what to do with it and I couldn't, so I decided it would be best if I didn't have it and I stepped to the nearest window sill and left it there." Kenneth Grady saw the defendant place the bottle on the window sill. It was later recovered by Dean Patience and was introduced in evidence as an exhibit.

Defendant testified that after he entered Copely Hall he became ill on the way to his room and he stopped in the rest-room, but he indicated that his surveillance was not such that this could not have happened without him seeing it. Defendant went to his room and studied with some other students and later went to sleep. He testified that about four o'clock he became ill again, and that when he vomited this time he "filled the sink plumb full to the top" and then went to a second sink "and got it half full," and that in the vomit there was "something red, which I assumed to be blood." His roommate, Robert Pulkka, testified that he saw defendant vomiting and he was "very sick." A few minutes later Dean Patience and Mr. William M. Stanton, the business manager of the college, arrived at defendant's room and took him to the Neurological Hospital in Kansas City. Dean Patience testified that when he conferred with defendant in his room he said nothing about being ill, but that Robin Firth, a student with whom defendant had been studying earlier, told him that defendant had been ill. Defendant testified that he went to the hospital willingly because he was very sick, and that on the way to the hospital he became

ill and continuously gagged and tried to vomit, and that Dean Patience accused him of "faking." Dean Patience and Mr. Stanton testified that defendant did not become sick on the way to the hospital, but that he told them that he had been sick and that he had vomited.

At the Neurological Hospital defendant was received by Dr. Rita Wetzel, a psychologist, to whom Dean Patience and Mr. Stanton related the circumstances of what had occurred at the college including what the defendant had told them about being sick. While defendant was at the hospital a towel in which he had vomited was sent to the Kansas City Testing Laboratory, and an analysis revealed a "positive test for arsenic." On May 11, at the hospital, defendant was questioned by the prosecuting attorney in the presence of his parents, and he denied that on May 9 he had had any arsenic in his possession. The only medical treatment defendant received while at the hospital, as revealed by its records, was the administration of a mild sedative and a medication by capsule which, according to Dr. Graham Parker, a privately practicing physician, was "most commonly used in such conditions as epilepsy or seizures or fits so to speak." Neither of these medications was a drug to be given to one suffering with arsenic poisoning. On May 12, a Sunday, the sheriff arrested defendant and took him from the hospital to jail. Dr. Wetzel indicated that she thought there was an agreement between defendant's parents, the hospital and the prosecuting officials to leave defendant there for a complete physical and psychiatric checkup, but she knew of no physical or mental reason why he should not have been released when the sheriff arrested him. Dr. Parker stated that in his opinion any person who had received enough arsenic to produce a bloody vomit would still be ill on the third day thereafter.

On the afternoon of May 12, while being questioned by the prosecuting attorney concerning his activities, defendant mentioned that there was another bottle of arsenic besides the one he placed on the window sill, and that there were two bottles missing from the college chemistry laboratory. He was asked how he knew about this and he stated that a young lady visitor at the Neurological Hospital had told him. When he was reminded that he had not been permitted to have visitors, he then said that a note had been sent to him by way of an intern. On the afternoon of May 9 it had been discovered that two bottles, one containing arsenic pentasulphide but labeled arsenic sulphide and the other containing arsenous trioxide, were missing from the display cabinet on the third floor of the science building at the college. Although this cabinet was usually kept locked, it was open the latter half of the morning of May 9.

On May 13 defendant was again questioned, and according to Mr. R. B. Miller, an attorney who was assisting the prosecuting attorney, defendant stated that the poison in the muffins was not the same poison that had been found in the pocket of his jacket, and he again referred to the note as his source of information. He said this note had been signed "H. E." and that he had thrown it away, but that he could not say who sent it because he did not want to get anyone else involved. Defendant then stated that "there is something else I feel I should tell you" and that "the arsenic found in my pocket is not the only arsenic in that hospital." He then told the prosecuting attorney and Mr. Miller that there was a bottle of arsenic in a blanket on a chest of drawers in the northeast bedroom of the Health Center. This room was one which had been occupied by Walter Holliday, a student patient. On May 9 Holliday had not been officially released, but he had been given permission to leave the Health Center. He was not present in his room after he left early in the morning of May 9, and he did not thereafter return to his room until May 10 and then only to pick up his personal effects. Mr. Miller and the prosecuting attorney went to the designated room

in the Health Center and they found a glass bottle, at the place stated by defendant, which was about half full and contained arsenous trioxide, a white powdery substance. This bottle, and the one containing arsenic pentasulphide, were the two bottles which were missing from the college chemistry laboratory. Defendant's explanation at the trial concerning his knowledge of the bottle of arsenous trioxide was that the prosecuting attorney and Mr. Miller had asked him questions "about people being poisoned and when they mentioned it I remember that I seen a bottle of arsenic Oxide in the hospital * * * in Walter Holliday's room * * * that morning [May 9] about 7:30 * * * in a fold of a blanket." He stated that during his work in the room he "had been bending over and I happened to see it," but he did not tell the officials at the Health Center about the presence of the bottle because he thought he should tell Walter Holliday first; "it was in his room and he was a chemistry student and I thought he ought to know about it." Defendant admitted that on May 9 he was in Holliday's room to clean the window sills after he completed raking leaves, but he stated that he was not there later than 11:30 o'clock. John Porter, a patient in a room across the hall, testified that "close to 12:00 o'clock" defendant was in Holliday's room "from three to five or six minutes" but he did not have a broom or any cleaning articles with him, and Mrs. Matthews testified that "approximately" at noon, after defendant had come in from raking leaves and immediately before he left the Health Center, she saw him come out of Holliday's room. Walter Holliday had previously taken a course in general chemistry, but at that time his major was mathematics and he was not a chemistry student. He denied possessing any arsenic or leaving any in the room.

On this appeal defendant does not challenge the sufficiency of the evidence, except in a limited respect pertaining to the proof of intent to be considered later. He first contends that the trial court erred in admitting testimony concerning a mophead, a papier-mache vase and some cleaning fluid; that the jury was thereby given the impression that defendant was an arsonist; and that the improper evidence was prejudicial and of the nature that its effect was not removed from the minds of the jury by the remarks of the trial court in instructing the jury to disregard it. A statement of this testimony and the circumstances of its admission and subsequent exclusion is necessary.

In the opening statement the prosecuting attorney started to relate in general terms the testimony he intended to present concerning a mophead and a papier-mache vase. Counsel for defendant stated that the prosecuting attorney should be confined to the offense charged. The prosecuting attorney then stated that "the testimony will go to show the motive in the cause. I will tie it with the charge alleged in the information." The court then stated that "with that understanding" he would permit the statement.

In the trial, Sally Eaton, the wife of a student at Park College, testified that in the late afternoon of May 8 she saw the defendant near the "gym," and she observed that he placed something in a trash can. When asked at what time she saw this occurrence, counsel for defendant objected on the ground that this testimony did not tend to prove or disprove any issue in the case. The court stated that "in view of the opening statement" he would overrule the objection. Mrs. Eaton then testified that she went to the trash can and found therein a light green papier-mache floral vase with a new dust mophead, and that in the vase there was "about an inch of some sort of substance that smelled like floor cleaner or floor polish." She took the items mentioned and gave them to Cal Holden, later identified as "an official in the voluntary fire department at Parkville." Mr. William R. Fish, identified in the record only as an investigator, testified that he was in the office of Dr. Robert E. Long,

president of the college, around 7:30 o'clock of the evening of May 8 when defendant was present and when Cal Holden brought in a large can, a papier-mache vase and a dust mophead. Defendant was asked if he had thrown anything away and he said that he had. According to Mr. Fish, defendant then stated that in his cleaning work he had used the vase to hold cleaning fluid, and that he had thrown away the vase and some old rags at the direction of Mrs. Markley. Dr. Long testified that on May 9 he went to the Health Center to get a can of Imperial cleaning fluid from Mrs. Matthews which he turned over to Dr. Gier, a professor of chemistry, along with the papier-mache vase, mophead and the substance found in the vase. Mrs. Markley testified that there had been such a vase at the Health Center, that she had asked Mrs. Matthews to determine whether or not any mops were missing, and that on May 8 she did not instruct defendant to throw away any vase. While Mrs. Markley was testifying defendant moved to strike out "all this testimony with reference to the vase and mop" on the ground that it did not prove any of the issues in the case. The court commented that he did not know what other testimony it "might attach to or connect with," so "at this time" the motion would be overruled. Mrs. Matthews then testified that she checked on the liquid cleaners and the mops and found one mop gone.

At the end of the state's case, the court made the following oral statement to the jury. "[T]he court now instructs you that all evidence introduced in this case up to this point referring to or bearing upon a mophead, a papier-mache flower vase and any liquid contained in the flower vase or with which the mophead might have been saturated or any odor in connection with the liquid, has no bearing on this case; that such evidence will be disregarded by you in arriving at your verdict and is by the court withdrawn from your consideration in this case." It does not appear whether this ruling was made at the request of the defendant or on the court's own motion, but it followed immediately after a recess and was followed by the announcement of the state that its case in chief had been concluded. Defendant made no motion to discharge the jury, and he did not request any other action by the trial court on the ground that the oral instruction withdrawing the evidence was insufficient to remove any prejudice resulting from its admission. See State v. Burchett, Mo.Sup., 302 S.W.2d 9.

The state does not now contend that the testimony concerning the vase and mophead was proper. Instead, it devotes its argument to the contention that under the circumstances the error of admitting it was cured by the withdrawal of the evidence and the oral instruction to the jury to disregard it.

In State v. Smith, 357 Mo. 467, 209 S.W.2d 138, 142, the question of the effect of the admission of improper evidence was exhaustively discussed, and it was there said that "when the objectionable evidence is obviously or spontaneously volunteered * * * or the evidence is patently not prejudicial * * * and when the court promptly, upon first objection, sustains an objection to the proffered evidence and instructs the jury to disregard it the appellant is precluded from further objecting to the prejudicial effect of the evidence unless he also requests some other action on the part of the court and finally moves the court to discharge the jury." The circumstances of this case obviously do not place it within the above rule. In the Smith case the court then continued: "But the fact that the court finally sustains an objection to the admission of evidence and withdraws the evidence from the jury's consideration or orally instructs the jury to disregard the evidence does not necessarily cure the error and in such instances a defendant is not always precluded from thereafter complaining upon appeal even though he has not requested the court to discharge the

jury, reprimand counsel or take some further affirmative action." In this latter circumstance for the admission of improper evidence which was later withdrawn to constitute reversible error, it must have been of the nature to have been prejudicial to the defendant and so impressive that the appellate court is of the opinion that its effect was not removed by the remarks of the trial court. State v. Burchett, supra; State v. Smith, supra; State v. Benson, 346 Mo. 497, 142 S.W.2d 52; State v. Martin, 229 Mo. 620, 129 S.W. 881.

Defendant asserts in his brief that the testimony pertaining to the vase and mophead was prejudicial because it "was merely to attempt to influence the jury by suggestion and innuendo that appellant set the notorious and much publicized fires at Park College which occurred about the time and just prior to appellant's arrest." There is absolutely nothing in the record about any fires, and this evidence does not tend to show that defendant set any fires or intended to do so. At most, it shows that he threw away some material in a trash can, perhaps wrongfully. As far as we can tell from the record the testimony was immaterial to any issue in the case, but we do not see how it could have been prejudicial to defendant. Under the circumstances it did not constitute incompetent evidence tending to prove the offense with which the defendant was charged, see State v. Richards, 334 Mo. 485, 67 S.W.2d 58; it was not incompetent evidence going "to the very heart" of defendant's defense, see State v. Benson, supra; it did not show the commission of another crime, see State v. Smith, supra, and State v. Eckstein, Mo.App., 5 S.W.2d 647; nor was it inflammatory, degrading or disparaging, see State v. Martin, 229 Mo. 620, 129 S.W. 881, Ann. Cas.1912A, 908, and State v. Mix, 15 Mo. 153.

It has long been the accepted and sound rule that a conviction will not be reversed because of the improper admission of irrelevant or immaterial evidence which is not prejudicial to defendant. State v. Green, Mo.Sup., 305 S.W.2d 863; State v. Hacker, Mo.Sup., 291 S.W.2d 155; State v. Evans, Mo.Sup., 237 S.W.2d 149. In this case, in addition to the fact that the immaterial and irrelevant testimony concerning the vase and mophead does not appear to have been prejudicial, the trial court did subsequently strike out all of that testimony and instruct the jury to disregard it. This was all that the defendant asked the court to do (in fact from the record it appears to be more than was requested), and apparently defendant was then satisfied that the action of the trial court was sufficient to remove the prejudice, if any, resulting from its admission. Under these circumstances this case is clearly within the rulings of State v. Tourville, Mo.Sup., 295 S.W.2d 1, certiorari denied, 352 U.S. 1018, 77 S.Ct. 575, 1 L.Ed.2d 554; and State v. Michels, Mo.Sup., 255 S.W.2d 760, and reversal is not required.

Defendant next contends that the state "failed to prove by its own witness that appellant mingled poison with food with intent to kill or injure Luella Matthews (Dr. Thurman's testimony at page 213 of the transcript)."

Dr. Thurman was the physician who treated Mrs. Matthews on May 9. He stated that in his opinion it "might be possible" for a person who had received the amount of arsenic estimated by the chemists to have been in a muffin to survive without medical aid, but the person would be "clinically sick" for a week. In the course of his examination he testified that he could not say whether or not Mrs. Matthews would have sustained "serious injury or maybe death" if she had not received medical attention because, as a physician, he did not know how much arsenic she had received, and "I couldn't say that the symptoms that she showed me would indicate that it might make her critically ill or involve her life." It is upon this isolated statement that defendant principally relies. However, on further examination the doctor stated that by reason of having taken the arsenic Mrs.

Matthews was "very definitely" ill, that she was "quite sick" but that it was "hard to say how sick."

 There is no question but that Mrs. Matthews became very ill immediately after eating a muffin containing arsenic and that the arsenic was the cause. There is not the slightest indication, and the contention is not made, that the arsenic was placed in the muffins by accident. Generally an intent, as an element of an offense, is not susceptible of direct proof, but may and generally must be established by circumstantial evidence. State v. Whitaker, Mo. Sup., 275 S.W.2d 316; State v. Chevlin, Mo.Sup., 284 S.W.2d 563. The necessary intent to kill or injure in this case may be inferred from the circumstances. To hold otherwise would be the equivalent of permitting a defendant charged with shooting another with intent to injure to say that while he shot with the intent of hitting his victim, he did not intend for the bullet to injure him.

██ Defendant's last contention is that the testimony of state's witnesses R. B. Miller and William Fish concerning defendant's statements to them was improperly admitted because the statements were not shown to be voluntary, and also because "a part of the discussion concerning the court's passing on the voluntariness of the statements for the purpose of determining their competency, was had in the presence of the jury."

Mr. Fish was asked concerning statements made by the defendant after he had been removed from the hospital. Counsel for defendant stated that he would like to ask a preliminary question, and he then examined the witness in the presence of the jury concerning the voluntariness of the statements. The substance of Mr. Fish's answers was to the effect that the statements were voluntary. Then upon questioning by the prosecuting attorney the statements were related by the witness. No testimony of Mr. Fish, in which he told of

or related statements of defendant, was objected to on the ground that the statements were involuntary, and the only examination of this witness as to the voluntariness of the statements was conducted by defense counsel without a request for a preliminary hearing on that issue out of the hearing of the jury.

When Mr. Miller was asked whether defendant had made any statements, objection was made that "there is no proper foundation laid to justify it." After a few additional questions the jury was excused from the room by the court without any request from defendant, and a conference was held off the record. The witness then testified, in the presence of the jury, that no force was used and that no threats or promises to defendant were made. When asked to relate the statements of defendant, objection was made because it had not been shown that the statements were voluntary, and the objection was overruled. After Mr. Miller related the statements a motion to strike the testimony for the same reason was made and it was overruled. At no time did defendant request a preliminary hearing out of the presence of the jury on the issue of the voluntariness of the statements.

It was stated in State v. Holliday, 353 Mo. 397, 182 S.W.2d 553, that upon request a defendant is entitled to a preliminary hearing on the question of whether a confession was voluntary, but it was held in that case that since no such request was made no error resulted. In State v. Wood, Mo.Sup., 266 S.W.2d 632, the same objection here presented was made, and it was there stated that the record of the trial disclosed that defendant did not make a request for a hearing out of the presence of the jury, and that "of itself" disposes of the contention of error.

Mr. Fish and Mr. Miller both testified that the statements of defendant which they related were voluntarily made by him. There was nothing to justify a ruling that as a matter of law they were involuntary.

Defendant elected to testify and he denied some of the statements and admitted others, but he did not testify that those he admitted making were made involuntarily by him. Under the circumstances, the issue of whether the statements were made voluntarily was a jury question, and defendant is not entitled to complain that no preliminary hearing was held out of the presence of the jury when he did not request it and when such a hearing was not denied him.

The judgment is affirmed.

BOHLING and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur.