No. 48,262

S<small>TATE</small> <small>OF</small> K<small>ANSAS</small>, *Appellee*, v. B<small>ILLY</small> J. H<small>ENSON</small>, *Appellant*.

(562 P. 2d 51)

Opinion filed March 5, 1977.

*Patrick J. Hurley,* of Leavenworth, argued the cause and was on the brief for the appellant.

*Patrick J. Reardon,* County Attorney, argued the cause, and *Curt T. Schneider,* Attorney General, was with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: Defendant-appellant, Billy J. Henson, appeals from a conviction by a jury of first degree premeditated murder in violation of K. S. A. 21-3401.

On August 23, 1971, Marsha Lynn Smith, a young woman, was found dead on a bed in the bedroom of her Leavenworth apartment. Detective Charles Scharer, of the Leavenworth Police Department, commenced the investigation by examining the scene of the crime. Scharer was an officer with nineteen years' experience in law enforcement and had participated in the investigation of approximately three hundred homicides. He found the body of the deceased lying face up on the bed, nude from the waist down. The victim's throat had a deep cut and there were numerous stab wounds in the chest. Scharer took a number of photographs of different angles of the body and of the scene of the crime. Three more photographs were taken during an autopsy and were admitted into evidence at trial over defendant's objection that they were irrelevant and prejudicial.

In addition to photographing the scene Scharer testified that the entire apartment was dusted for fingerprints. During the course of this examination Scharer found what appeared to be a "bloody palm print" located on the inside door above the lock or night latch. Scharer testified that during his years in law enforcement, including the investigation of many homicide cases, he had become familiar with the appearance of blood and it was his opinion that the palm print was etched in blood. This palm print was eventually

sent to the Federal Bureau of Investigation with palm prints taken from the defendant and others. Examination by the FBI resulted in identification of the bloody palm print at the scene as that of the defendant and "of no one else," according to the testimony of FBI agent Herbert Odell Rogers at trial.

Scharer, together with other investigating officers, found a knife and scrapings that appeared to be blood samples, which were obtained from the door of the apartment immediately below the victim's apartment. Scharer also testified that he found no Sunday Leavenworth Times or any other recent newspapers in the apartment.

The following day an autopsy was performed on the victim's body by Dr. Earl Wright, a pathologist, who testified as an expert witness for the state. His examination revealed the victim's throat had been cut through to the vertebral column. Dr. Wright also found seventeen separate stab wounds in the chest which were grouped within a small area. He testified that at least nine of the wounds had punctured the heart. He described the grouping of the stab wounds as showing a "lack of randomness" and slightly unusual in that the lungs were not penetrated but only the heart. Dr. Wright further described the cause of death as either the neck laceration or the stab wounds which penetrated the heart—either would have been sufficient to kill. He also found evidence that the decedent had been sexually assaulted.

Further police investigation revealed that the defendant knew the decedent, was familiar with her and that on the probable night of the murder, Saturday-Sunday, August 21-22, the defendant was looking for the decedent. The investigation further disclosed that in the latter part of July 1971, three to five weeks before the homicide, the defendant had committed a civil wrong against Lou Ann Lee, sixteen years of age. Miss Lee testified that on the occasion defendant threatened her with a knife, which she managed to wrest away from him; that he put his hands around her neck and simulated intercourse with her, at which point she was able to escape and later reported the incident to the police.

Defendant took the witness stand in his own behalf and, regarding the weekend of the murder, testified that on Saturday, August 21, 1971, at approximately 10:30 or 11:00 p. m. he went to the victim's apartment for the purpose of meeting one Larry Workman and selling him some drugs. Apparently, Workman was a boyfriend of the victim. According to the defendant, Workman did not

come to the apartment as anticipated. Defendant described what happened on his visit to the apartment in these words:

"A. I walked up the stairs, knocked on the door, and there was no answer. The door went open a little ways, and I stuck my head in and yelled, "Is Larry here?' At which time I saw Marsha Smith lying on the bed. I went over to see if there was anything I could do, which I found there was nothing to do, because her head was almost severed. I turned around and not knowing what to do, I heard a police car, and I got scared and I stayed in the apartment until the siren quit, and I left the apartment and ran to my apartment and tried to figure out what I should do, which I could not figure out anything to do, because I was so scared.

"Q. Now did you go to the police?

"A. No, I did not.

"Q. Why didn't you?

"A. I was too scared. I didn't want to be connected with anything that brutal and vicious."

Defendant was questioned two months later about the murder by officers of the Leavenworth Police Department, but failed to tell them about his presence at the scene of the crime at this time. During this interrogation, however, defendant was also questioned about, and admitted his involvement in, an unrelated burglary. After pleading guilty to this burglary charge, defendant was placed on probation.

In January 1972 defendant violated the terms of his probation, went AWOL, and took up residence in the home of his parents in Springfield, Missouri. He was arrested for desertion on April 7, 1972, and thereafter questioned extensively about the Marsha Smith murder by two Kansas Bureau of Investigation agents. Defendant again failed to reveal that he had been at Marsha Smith's apartment on the Saturday night in question.

Defendant was the only witness called by the defense. He testified at great length about his activities in the Leavenworth area during the months preceding the murder while he was in the army stationed at Fort Leavenworth. He testified in considerable detail about his involvement with the use of narcotics and other unlawful activities during this period. He admitted that he knew the victim, but denied having killed her. On cross-examination, over objection, he was interrogated concerning his efforts to prevent extradition from Missouri. His testimony will be further discussed in the course of the opinion as related to the points raised.

The state called Shirleen Wright as a rebuttal witness, who testified that she knew the victim during the summer of 1971, and had been to her apartment approximately ten times. She testified

that about every time she was at Miss Smith's apartment the defendant was also there. She further testified of a conversation with defendant about Miss Smith and that the defendant told her that he had had intercourse with Marsha Smith.

The defendant specifies eight points of error on appeal which will be considered in the order presented.

Defendant's first point on appeal is that there was no substantial evidence to support the jury's finding of premeditation as an element of first degree murder. Defendant's argument on this point is essentially a review of the evidence concerning the condition of the body and room in which it was found. Defendant concludes it was insufficient to establish the element of premeditation as required in a first degree murder charge.

Proof of premeditation as an element in first degree murder was considered in the recent case of *State v. Hamilton*, 216 Kan. 559, 534 P. 2d 226, wherein we held:

"The element of premeditation, essential to first-degree murder, is not to be inferred from use of a deadly weapon alone, but if, in addition, other circumstances are shown, as, for instance, lack of provocation, the evidence may be sufficient to support an inference of deliberation and premeditation." (Syl. 6.)

While we indicated in *Hamilton* that the use of a deadly weapon is insufficient, standing alone, to establish premeditation, we further said:

"While use of a deadly weapon is not alone sufficient to infer premeditation it is one of the circumstances which may be considered in determining whether a homicide was committed with deliberation. . . ." (p. 567.)

This accords with prevailing authority on the subject. (See 40 Am. Jur. 2d, Homicide, § 439, pp. 700-701; 1 Wharton's Criminal Evidence [13th Ed.], § 135; and cases collected in an annotation in 96 A. L. R. 2d, Anno., Homicide-Premeditation, commencing at page 1435.) In addition to the use of a deadly weapon other circumstances may be relevant to establish premeditation. Some of these circumstances are listed in 1 Wharton's Criminal Evidence (13th Ed.) at page 227:

"Premeditation and deliberation can be found from various circumstances, such as the nature of the weapon used, the lack of provocation, the defendant's conduct before and after the killing, threats and declarations of defendant before and during the occurrence, or the dealing of lethal blows after the deceased was felled and rendered helpless."

The instant record discloses the use of a knife with a six inch blade, one inch in width—obviously a deadly weapon. The photo-

graphs introduced by the state show the stab wounds to be centered in and around the victim's heart, which indicates both deliberation and premeditation when considered with other evidence. The photographs also demonstrate the viciousness of the killing by showing the multiple stab wounds, and the fact the victim's throat was slashed clear back to the spinal cord with one slice of the knife. The evidence disclosed that either the stab wounds in the heart or the slicing of the victim's neck would have caused death, thus an inference could well be drawn that there was a striking of lethal blows after the victim was rendered helpless. There was also evidence of defendant's conduct both before and after the killing which tended to show premeditation. There was evidence of defendant's use of a knife in a recent civil wrong, similar in several respects to the acts perpetrated here. The defendant knew the victim and there was evidence that on the probable night of the murder defendant was looking for her. Although defendant discussed the homicide with the police on two occasions, prior to his arrest, he did not tell the police of his presence in the victim's apartment, but admitted it only after he learned that he had left an identifiable palm print on the door. We believe there is ample evidence of circumstances from which a reasonable inference of premeditation could be drawn.

In his second point defendant contends the trial court erred in admitting, under the provisions of K. S. A. 60-455, the testimony of Lou Ann Lee, a state's witness, whose testimony pertained to a prior civil wrong committed by defendant and involving her. In support of his point, defendant submits a two-pronged argument. First he argues the court should have held an evidentiary hearing with Lou Ann Lee present to testify. He further contends that in any event her testimony was inadmissible.

On August 9, 1974, eleven days before trial, the state filed a motion to determine admissibility of evidence to be offered under the provisions of 60-455. The motion set forth what the evidence would consist of as follows:

"That the evidence sought by the State to be declared admissible is the evidence and testimony of one Lou Ann Lee concerning another occurrence in Leavenworth, Kansas, in the latter part of July, 1971, in which the above defendant, possessing a knife, threatened to kill a young girl who was breaking up with him, one Lou Ann Lee, and when said young lady talked the defendant into giving her the knife and had thrown the knife behind the bed, the defendant jumped on top of said young lady, put his hands around her throat, started to choke her, and moved his body as though making love to her at the same time. The said Lou Ann Lee finally broke loose from the

defendant and ran and was caught by the defendant on the stairs, at which time she was rescued by the appearance of her brother."

The motion further alleged the evidence was admissible on the issues of identity or absence of mistake or accident. A hearing was had on August 16, 1974, at which time the county attorney orally informed the court in somewhat more detail as to what Lou Ann Lee's testimony would consist of. Defendant's counsel stated to the court:

"Your Honor, on behalf of the defendant, Billy Henson, I am aware of the substance of the testimony. In fact, I have interviewed this witness. . . ."

After hearing the arguments and statements of counsel the trial court announced:

"I just can't believe either that the hearing is required in the sense that the evidence has to be presented to the Court, as the county attorney stated here. I think we can go on the basis of the statement contained in the motion, and if the testimony should be otherwise, of course, it would result in a mistrial. This is a risk, I guess you would say, that the state has to assume. . . ."

As recommended in *State v. Bly,* 215 Kan. 168, 523 P. 2d 397, the state did file a pretrial motion and a hearing was had prior to trial. This procedure forestalls interruption of the trial and waste of jury time. It is true, Miss Lee was not called as a witness, but the record discloses the court was fully informed. Defense counsel was not surprised and in fact had interviewed the witness. He was afforded an opportunity to cross-examine at trial, when, in any event, the final ruling of the court must be made. Under the facts and circumstances, we find no error in the procedure such as that criticized in *State v. Wasinger,* 220 Kan. 599, 556 P. 2d 189, where a whispered discussion between court and counsel concerning the admissibility of evidence under 60-455 took place before the bench at trial.

We turn now to defendant's further contention that in any event Miss Lee's testimony was inadmissible. Her testimony at trial conformed closely with what was stated in the state's pretrial motion. She testified that during the summer of 1971 she had dated the defendant for a period of three weeks to a month; that during this period defendant on two or three occasions made some reference to Marsha Smith when they saw her; and that on several other occasions he made reference to her by name. She further testified that the incident here in question arose when she attempted to break off her relationship with the defendant. She testified that on the evening of the incident her brother drove her and the defendant from her home to the defendant's apartment for the purpose of

delivering several "loads" of laundry. When asked if she went up to the defendant's apartment with him she answered:

"A. Yes, I did. He had several loads of laundry, and I thought I would help him carry them up and get rid of him faster.

"Q. Did your brother go up with you?

"A. No, he stayed downstairs and listened to the radio.

"Q. When you got up into his apartment, was it upstairs?

"A. Yes.

"Q. And when you got up into his apartment, tell the jury then what happened?

"A. Well, he threatened me with a knife and told me he was going to kill me, and I talked him out of the knife. I don't know how I managed it, but I did, and threw it behind the bed. As soon as I did that, he jumped on me. I was screaming, and he put his hand around my neck and told me not to scream. He made motions over my body like he was trying to make love to me, and I finally managed to escape through his back door. And we were on the stairs, and my screaming attracted my brother's attention, and his appearance was my rescue."

On cross-examination Miss Lee testified defendant wanted to go home with her and her brother and got in the car with them, over her objection. After driving about a half block, they were almost in front of the police station, when she asked her brother to stop and she got out of the car. She further testified:

"Q. And then what did you do when you got out of the car?

"A. I realized I had left my purse in the car and it was in the back seat. I ordered Billy to give it to me, and he said he wouldn't.

"Q. You're outside of the car now?

"A. Yes.

"Q. And you were running along side of the car?

"A. No, it's stopped.

"Q. All right.

"A. And he wouldn't give it to me. After a brief period of argument, he got out of the car and went around to the side where I was, I was on the driver's side, with my purse, and I told him to give me my purse, and he said he wouldn't give me my purse. Finally I made a grab for my purse, and at the same time at this point I was cussing him out, and he slapped me across the face and my glasses flew across the street. And my brother at this time was definitely sure what was going on, and fortunately there was a policeman standing outside who saw the car. I ran over to the police department.

"Q. Let me stop you there a minute. Were you hysterical at this point?

"A. No, by this point I had regained my control. I felt I was out of immediate danger.

"Q. You were calmly directing your brother as to what to do?

"A. There is a difference between calmly and angry authoritarian. I was not hysterical, I was in control of myself, but I wanted my brother to know that this was a dangerous situation, that we had to do something immediately.

"Q. Did your brother get out of the car and run?

"A. No, there was no real need for him to. He couldn't leave the car sitting in the middle of the street, and he realized that I was going to the police station, and he also had seen the policeman outside, front, I do believe.

"Q. Okay. Did you go to the police station?

"A. Yes.

"Q. And did you go inside the police station?

"A. Yes. And the man greeted me with, 'I already called a car,' and I said 'Good.'

"Q. And did you then tell the police that you were concerned for your well being?

"A. Yes.

"Q. And isn't it true they didn't do anything?

"A. They didn't do a thing.

"Q. And told you to come back Monday?

"A. Yes, and this was a Friday night. Didn't help me in the least, but I was pretty cynical then.

"Q. And did your brother and Billy come into the police station?

"A. Yes. I believe they parked the car and walked on over. I wasn't there as he——

"Q. You and your brother and Billy went in the police department, and you were telling the police you were in fear for your well being, and you had been attacked?

"A. Yes.

"Q. And one or more of the police officers hearing this, told you to come back Monday and this was on a Friday.

"A. They told me there was nothing at that time they could do. If I wished to file a complaint, that I would have to do it on a Monday. They couldn't do anything on a Friday night at eleven. I asked them to please hold him here long enough for me to get home, it would only take me fifteen minutes. By the time I got home Billy was already on the phone to my mother.

"Q. So they didn't hold him?

"A. That's what it appeared.

"Q. And did you go down Monday and file your complaint?

"A. No.

"Q. Did you ever file a complaint?

"A. No."

On redirect examination Miss Lee was asked why she did not file a complaint and she replied:

"A. First the reaction that I got when I was obviously in fear of my life, second we were leaving town in January. From even what little we knew, we realized any sort of complaint like this would take a lot longer than to January to settle it. My parents were going to Hawaii, and thirdly my father was in Viet Nam and my mother naturally was under an extra load, because my father wasn't there, and she really didn't feel that she could handle it. It was the same sort of thing that goes on all of the time. I regret it severely now, but I was sixteen then and not twenty."

K. S. A. 60-455 provides in pertinent part:

"Subject to section 60-447 evidence that a person committed a crime or

civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed another crime or civil wrong on another specified occasion but, *subject to sections* 60-445 and 60-448 such evidence *is* admissible when *relevant* to prove some other *material fact* including . . . intent . . . knowledge . . . or absence of mistake. . . ." (Emphasis supplied.)

It is to be noted the statute specifically includes civil wrongs together with other crimes. If the requirements for admissibility are otherwise satisfied, an actual conviction is not a prerequisite to the admission of evidence of other offenses. (*State v. Miller,* 204 Kan. 46, 460 P. 2d 564; and *State v. Bly,* supra.) We have discussed in many cases the principles to be considered by a trial court in determining the admissibility of such evidence. Most recently these principles were summarized in *State v. Faulkner,* 220 Kan. 153, 551 P. 2d 1247, wherein we stated:

"In ruling on the admissibility of evidence of a prior conviction under 60-455, a district court must (1) determine it is relevant to prove one of the facts specified in the statute, (2) determine that fact is a disputed material fact —*i. e.* that it is substantially in issue and (3) balance the probative value of the prior conviction evidence against its tendency to prejudice the jury." (p. 155.)

While the instructions are not reproduced in the record before us, it appears the trial court found the 60-455 elements of intent, identity and absence of mistake to be at issue and limited the jury's consideration of Miss Lee's testimony accordingly. Obviously, identity of the perpetrator was the critical issue at trial. Where a prior conviction or civil wrong is offered for the purpose of proving identity, evidence should disclose sufficient facts and circumstances of other offenses or civil wrongs to raise a reasonable inference that defendant committed both. (*State v. Donnelson,* 219 Kan. 772, 549 P. 2d 964.) In other words, similarity must be shown in order to establish relevancy. (*State v. Bly,* supra; *State v. Cross,* 216 Kan. 511, 532 P. 2d 1357; and *State v. Johnson,* 210 Kan. 288, 502 P. 2d 802.) The similarity of offenses is a key factor in relevancy. (*State v. Masqua,* 210 Kan. 419, 502 P. 2d 728, cert. den. 411 U. S. 951, 36 L. Ed. 2d 413, 93 S. Ct. 1939.)

Although there is disparity between the severity of the crime charged and the prior civil wrong, we believe there are other similarities sufficient to render the challenged evidence admissible within the trial court's discretion on this issue of the case. It should be noted there is no way of ascertaining to what extremes the violence would have gone had not the witness, Miss Lee, been able

to effect her escape from the defendant. The difference in the gravity of the two offenses, although not conclusive on the trial court, is an important factor to be weighed by it in assessing the probative value of the evidence and in determining its admissibility. Numerous similarities weigh in favor of the admissibility of this evidence. Both offenses occurred in the privacy of an apartment and involved girls of approximately the same age. In each instance the defendant was shown to have either dated or to have been with each girl on numerous occasions with some evidence of defendant's prior romantic inclinations toward both of the girls. The evidence shows a knife was used on each occasion of violence, and at one point the attack on both girls focused on the neck or throat of the victim. Finally, and most probative of all of these similarities because of its highly individualistic character, there is evidence from which it may be inferred that each attack was partially motivated by or connected with sexual desires.

As to the element of intent under 60-455, there can be no doubt that this killing was committed maliciously and willfully. Based on the testimony of Dr. Wright there can be no question of the perpetrator's intent to kill. Thus, the criminal intent at the precise moment the crime was committed cannot be said to be substantially at issue. However, as previously indicated, premeditation was an important and hotly contested issue in this case. While something more than mere intention to kill must be shown to establish premeditation (40 Am. Jur 2d, Homicide, § 439, p. 700) the antecedent intent of a killer is relative to the issue of premeditation. Premeditation is the process simply of thinking about a proposed killing before engaging in the homicidal conduct. (1 Wharton's Criminal Evidence § 135, p. 224.) Although the knifing incident testified to by Lou Ann Lee stopped short of bloodshed, we, nevertheless, believe evidence thereof was relevant to prior intent as related to premeditation under the circumstances of this case.

The record fails to reveal any objection at trial to the statutory elements of absence of mistake or accident. The addition of inapplicable elements to the limiting instruction under 60-455 has never been held to be clearly erroneous. (State v. Moore, 218 Kan. 450, 543 P. 2d 923.)

For the foregoing reasons we find no prejudicial error in the admission of Lou Ann Lee's testimony or in the procedure employed in connection therewith.

Defendant next contends the trial court erred in admitting certain

photographs into evidence. The record reflects that defendant objected to eight photographs which were identified as Exhibits Nos. 4, 5, 6, 7, 16, 17, 18 and 19. All of the Exhibits in question were 9 x 8 inch, black and white photographs. Such photographs would not have the shocking impact on a jury as would colored transparencies or slides displayed on an enlarged screen, which, even though gruesome, have been held to be admissible when relevant to issues at trial. (See *State v. Wilson*, 220 Kan. 341, 552 P. 2d 931; *State v. Campbell*, 210 Kan. 265, 500 P. 2d 21; and *State v. Hill*, 193 Kan. 512, 394 P. 2d 106.) The long-standing rule, followed in this jurisdiction, was stated in *State v. Booker*, 200 Kan. 166, 434 P. 2d 801, cert. den. 391 U. S. 965, 20 L. Ed. 2d 879, 88 S. Ct. 2031, in these words:

". . . Even though gruesome, photographs properly identified, as representing physical objects which constitute a portion of a transaction which serve to unfold or explain it, may be exhibited in evidence whenever the transaction is under judicial investigation. . . ." (p. 168.)

The substance of the rule has been restated in various forms in numerous recent cases coming before this court. In the recent case of *State v. Wilson*, supra, Mr. Justice Fromme speaking for the court expressed the rule in these words:

". . . In a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to testimony of a doctor as to the cause of death even though they may appear gruesome. (citing cases.)" (pp. 346-347.)

See, also, *State v. Villa & Villa*, 221 Kan. 653, 561 P. 2d 428.

In the case at bar the photographs, although black and white reproductions, are admittedly gruesome, but this was a gruesome crime. They were relevant to the critical issues in the case, one of which, as has been previously indicated, was premeditation. The photographs depicted the violence of the crime. The photographs of the room tended to show a lack of provocation on the part of the victim. As related to Dr. Wright's testimony, the stab wounds showed a lack of "randomness" and also the probability that some of the wounds were inflicted after the victim was dead or rendered helpless. The photographs of the partially disrobed body corroborated Dr. Wright's testimony of sexual intercourse, and were related to the state's evidence concerning defendant's assault on Lou Ann Lee. All of this was relevant to the issue of premeditation. While there were five photographs of the room and body, they

were taken at different angles. The condition of the room connected with other evidence related to the time of the crime, which was important evidence on the issue of identity. The showing of blood in the photographs related to the bloody palm print about which there was no explanation by defendant until after the state had closed its case. Under the circumstances, we cannot fault the trial court's admission of the five photographs on the ground that they were repetitious.

Two of the three photographs taken at the autopsy were of the victim's heart isolated from the rest of her body. We do not consider these two photographs to be gruesome. They corroborated Dr. Wright's testimony of a "lack of randomness" and that the heart had been pierced nine times. The third autopsy photograph depicted Dr. Wright examining the victim's throat wound. It corroborated Dr. Wright's testimony as to the size of the knife used; that the wound appeared to have been inflicted with one slash and also that either the throat laceration or the heart stabs would have been fatal, which related to the basis for the drawing of an inference of wounds inflicted after the victim was dead or rendered helpless— a circumstance relevant to the issue of premeditation.

We cannot approve the wholesale admission of repetitious, grotesque and bloody photographs which add nothing to the state's case. (*State v. Clark,* 218 Kan. 18, 542 P. 2d 291.) But this is not the situation at bar. All of the photographs were relevant to the issues of premeditation or identity and the time of the crime. Even where the defendant concedes the fact of the victim's death, and the cause thereof, the prosecution has the burden to prove all elements of the crime and photographs relevant thereto are admissible.

The issue at bar is presented in context similar to that before the court in *State v. Jones,* 218 Kan. 720, 545 P. 2d 323, wherein the state offered colored slides of the victim's body lying on a morgue slab for the purpose of showing the nature and extent of the wounds in order to establish premeditation and malice in a first degree murder prosecution. In finding no error we said:

"Unlike *Boyd* and *Clark,* the photographs admitted by the trial court in the instant case, while admittedly gruesome and grotesque, were not offered solely to inflame the minds of the jurors. Since the state's case was based upon the elements of premeditation and malice it was necessary for the state to satisfy these elements by proof of the nature and extent of the wounds inflicted upon the body of the victim. . . ." (pp. 724-725.)

Defendant next claims error in the admission of the testimony of

Margaret Fanghor, the victim's mother, and Minda Kellogg, her sister. Their testimony established the victim as a neat housekeeper, which negated the possibility that defendant's palm print was placed on the door at some time previous to the murder. They also testified as to the victim's habit of purchasing a Sunday newspaper, the absence of which related to the time of the murder. The time of the victim's death and her good housekeeping habits, as related to the bloody palm print, were material facts. Relevant evidence is evidence having a tendency in reason to prove any material facts (K. S. A. 60-401 [b]). We find no error in this regard.

Defendant's fifth point of error relates to a possible conversation of a state's witness with one of the jurors during the trial. Defendant contends the trial court's inquiry into the matter was insufficient. Prior to the commencement of the third day of trial it was reported to the court that Herbert Rogers, the FBI fingerprint expert, had been seen talking to a juror in a hallway outside the courtroom. A hearing was had in chambers and Mr. Rogers was examined by counsel for the state and defendant. Rogers testified that he was not familiar with the twelve jurors and did not know whether the people he conversed with were jurors. He testified that in any event the conversation consisted only of pleasantries; that he did not mention that he was a witness; and that absolutely nothing was said in connection with the trial or his abilities as a fingerprint expert. After hearing the testimony of Rogers, the trial court was satisfied the conversation did not concern the case and denied defendant's motion for a mistrial. Defendant, nevertheless, contends the court should have made further inquiry and failure therein requires a reversal. We do not agree. The statutory provisions for declaring a mistrial for such conduct in a criminal case are set forth in K. S. A. 22-3423 [1] [c]. Whether the conduct in question requires a mistrial, under the broad grounds defined in the statute, is a matter of discretion with the trial court. Jury misconduct will not constitute a ground for reversal unless it is shown to have substantially prejudiced the rights of either the defendant or the prosecution. (*State v. Rhodes*, 219 Kan. 281, 546 P. 2d 1396; and *State v. Finley*, 208 Kan. 49, 490 P. 2d 630.) In determining whether a particular instance of improper communication between a juror and a witness amounts to prejudicial misconduct which will prevent a fair trial, the nature of the communication is of significance. Generally, when the communication is entirely unrelated to defendant's case there is insufficient prejudice to require a new trial.

(*State v. Culbertson,* 214 Kan. 884, 522 P. 2d 391. See, also, 9 A. L. R. 3d Anno., Jurors-Communications With Witnesses, § 9 [a], p. 1289.) No prejudice to defendant's case is shown here, and we find no abuse of discretion in the trial court's disposition of the matter.

Defendant next contends the trial court erred in admitting the testimony of Detective Scharer pertaining to the "bloody palm print" on the door of the victim's apartment. Defendant says the state should have secured a chemical analysis to establish, scientifically, that the palm print was etched in blood. Defendant also says that Scharer was not qualified to testify as an expert on the matter. The state's failure to make a chemical analysis goes to the weight and credibility of the evidence rather than to its admissibility. (*State v. Watkins,* 219 Kan. 81, 547 P. 2d 810; and *State v. Curtis,* 217 Kan. 717, 538 P. 2d 1383.) Whether a witness is qualified to give opinion testimony is to be determined by the trial court in the exercise of its discretion. (*Coonrod v. Walz Constr. Co., Inc. v. Motel Enterprises, Inc., et al.,* 217 Kan. 63, 535 P. 2d 971.) Moreover, the defendant, in presenting his case, explained how the bloody palm print might have been made after he admitted that he had been in the victim's apartment after the murder. We find no merit in the defendant's contention.

Prior to cross-examination of defendant, an out-of-court hearing was held concerning the prosecution's right to cross-examine defendant concerning his refusal to waive extradition after his arrest. The state argued that since the defendant had testified at great length about his life of crime in Leavenworth, which the state claimed was a trial strategy to impress the jury that he was admitting all of his misdeeds, and, therefore, the state should be entitled to bring out on cross-examination that defendant had refused to waive extradition—a fact which he omitted from his account. The state also argued that by his detailed recital of wrongdoing, the defendant opened the door and that the proposed cross-examination was permissible as falling within the scope of his direct examination. The trial court permitted the state to cross-examine and defendant now claims error.

In response to the prosecutor's cross-examination defendant testified:

"Q. What occasioned the delay?
"A. I decided not to sign the extradition papers to come back to Kansas.
"Q. You fought extradition back to Kansas?
"A. Yes, sir, I did.

650

"Q. And you had an attorney down there, didn't you?
"A. Yes, sir.
"Q. And finally the court down there ordered your return to Kansas on our extradition warrant?
"A. Yes, they did."

We find no Kansas case which has dealt with this issue. Courts of sister states have differed in their treatment of the question. (See 22A C. J. S., Criminal Law, § 628, p. 477.) Some courts have held it proper to admit the fact of extradition and that the accused resisted. (*State v. Foster*, 80 N. H. 1, 113 A. 211; *Orrin J. Brown v. The State*, 143 Tex. Cr. R. 358, 158 S. W. 2d 1018.) Other courts have held to the contrary stating that waiver of extradition is no evidence of innocence, and resistance is no evidence of guilt. (*e. g.*, *Commonwealth v. New*, 354 Pa. 188, 47 A. 2d 450; and *State v. Martin*, 229 Mo. 620, 129 S. W. 881.) We believe the rationale of the last cases mentioned to be the better reasoning. Kansas and Missouri are each a party to the Uniform Criminal Extradition Act and Compact (K. S A. 22-2701, *et seq.* [and K. S. A. 1976 Supp.]). Under the provisions of the Act every accused person is afforded the right to have extradition adjudicated. In the instant case, defendant was merely exercising his statutory rights within the state of Missouri in refusing to execute a waiver of extradition. Refusal to waive statutory rights in connection with extradition is to be distinguished from an accused's refusal to furnish handwriting exemplars or voice samples where no statutory rights are involved. (See *State v. Haze*, 218 Kan. 60, 542 P. 2d 720.)

However, as the state points out, the question is posed in an unusual setting in this case. The state has filed a supplemental record, the bulk of which consists of the opening statement of defendant's counsel (five pages) and seventy-five pages of defendant's testimony. Defendant's counsel devoted much of his opening statement to a history of defendant's misdeeds in Leavenworth, all of which was restated in detail by defendant in his testimony. Defendant related in much detail his association with the "Third Street House" a group involved in the use and sale of drugs and other criminal activities. We must agree with the state that this appears to have been a strategy of defendant, designed to impress the jury that he had told all of his misdeeds and was now telling the truth as to his innocence on this single occasion. The state claims that defendant's emphasis on his unsavory life style in Leavenworth opened the door to cross-examination on defendant's refusal to waive extradition. We cannot agree for the reasons we

have stated, but we do believe the defendant's testimony and the statement of his counsel substantially lessened the possibility of any prejudice resulting from the cross-examination, so as to render any error harmless.

Whether inadmissible testimony constitutes harmless or reversible error depends upon the particular evidence and the circumstances of the case in which the question arises. (*State v. Bradford,* 219 Kan. 336, 548 P. 2d 812.) In view of the defendant's own testimony the challenged evidence could hardly be said to be so prejudicial as to substantially affect defendant's right to a fair trial.

. Finally, defendant claims error in the trial court's denial of a new trial, but he makes no additional arguments.

We have carefully examined all of defendant's contentions and arguments and find no error shown which would warrant the granting of a new trial.

The judgment is affirmed.

FROMME. J., dissenting. Exhibits 17 and 18 were admitted into evidence with no foundation to establish their relevance. They graphically show a human heart and portions of the lungs removed from the chest cavity and lying at the feet of the victim on the autopsy table.

The only foundation evidence upon which these exhibits rest is testimony of Detective Scharer who took the pictures and merely stated that Exhibits 17 and 18 were photographs of the victim taken at the autopsy. After the pictures were admitted over objection, the pathologist testified as follows:

"Q   Doctor, let me hand you, might help you, State's Exhibits 16, 17 and 18, which have already been admitted into evidence as pictures taken during your autopsy. Would you look at those, so perhaps they might help you in explaining the, your findings to the jury. That is you in one of those pictures, is it?

"A   Yes, it is.

"Q   And is that Marsha Smith, or the body of Marsha Smith there?

"A   Yes, it is."

I am in hearty agreement with the rule stated in paragraph 3 of the syllabus but the rule, although stated, is not followed by the court in this case. These pictures merely show the butchery which occurred in making the autopsy. The heart and portions of lungs laid upon the table at the feet of a victim do not show the nature and extent of the wounds inflicted by the defendant. They merely depict the butchery of the victim which occurred at the hands of

the pathologist. The pathologist testified the heart had been pierced nine times with a knife but these pictures of the heart did not show the stab wounds and they were not used by the witness to support his oral testimony in any way. The only possible purpose of the prosecution in introducing these pictures was to prejudice and inflame the minds of the jury. Such a practice should not be condoned by this court and I respectfully dissent.