No. 86,123

STATE OF KANSAS, *Appellee*, v. DANIEL PARKER, JR., *Appellant*.

(41 P.3d 789)

Opinion filed
March 8, 2002.

*Randall L. Hodgkinson*, deputy appellate defender, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Daniel Parker, Jr., convicted of first-degree murder, alleges that the trial court erred when it instructed the jury that the definition of premeditation is "to have thought over the matter beforehand for any length of time sufficient to form an intent to act," and when the prosecutor was allowed to comment on the credibility of witnesses during closing argument.

The victim, Taurean Wynn, was known to his friends and to those on the street as "Big T." Wynn was killed by gunshot wounds inflicted during an argument in the parking lot of the apartment where he lived. Nina Tate, who lived in one of the units near the lot, was interviewed by a police officer at the murder scene. Nina said that she saw Parker shoot the victim numerous times in the torso and then flee on foot. Two other witnesses, Marishawn Walker and Kizzy Kenner, initially told police that they heard multiple shots but saw nothing. The officer who interviewed Marishawn and Kizzy believed they were apprehensive. Five shell casings and a bullet fragment were recovered from the crime scene.

Nina Tate testified at trial that she lived in one of the units on Elmwood with both Marishawn and Marishawn's boyfriend, Wynn, whom she knew as "Big T." Wynn hung out in the parking lot and in Nina's apartment. Before Marishawn dated Wynn, she dated Parker, who was known as "Poochie."

The night before the shooting, Wynn, Marishawn, and Parker were at Nina's apartment with two other friends. They drank beer and smoked marijuana in Nina's living room for 2 to 3 hours. Wynn asked Parker for the $5 or $10 he was owed. Parker refused to pay him. Wynn retrieved a shotgun from upstairs and stuck the barrel in Parker's face. Parker gave Wynn the money and left immedi-

ately. This occurred at approximately 3 a.m. Nina described Parker's attire that evening in detail. Parker had worn black pants, a black shirt, a black leather jacket that came to the knees, and black work boots. Parker wore his hair in braids. At 4 or 5 a.m., the five people remaining at the party went to sleep in Nina's upstairs bedrooms. The men left between noon and 2 p.m. the following afternoon. Nina went back to bed.

Kizzy awakened Nina and told Nina that Parker was at Kizzy's and that she thought Parker was going to kill Wynn. Nina did not believe Kizzy. Nina took a bath. As Nina dressed, she heard Parker and Wynn arguing in the parking lot outside her apartment about money. Nina leaned out the window and observed Parker, who had a gun, chasing Wynn around a car. The gun had a clip. Nina had not seen Parker with the gun before that day. Nina went downstairs. When she stuck her head out her front door, she observed that Parker had the gun in Wynn's face. Parker then hit Wynn in the head with the gun to knock him down. Nina believed that Wynn, while lying on the ground, begged for his life and asked Parker not to shoot.

Parker shot Wynn in the stomach or chest. Wynn groaned. Parker shot again. Wynn was shot five times. Parker had bent over and fired the last shot into Wynn's neck as Wynn lay on his stomach. The entire shooting took a minute or two. Parker then ran away. Nina stated that she saw no one else in the lot and had no doubt that it was Parker who shot Wynn.

Kizzy Kenner lived in the end unit. The parking lot was closest to her apartment. Kizzy went from her apartment to Nina's apartment to call an ambulance. While Kizzy called, Nina and Marishawn went to Wynn. Wynn was alive and breathing. Wynn stopped breathing as the ambulance arrived.

During a conversation after the shooting, Kizzy told Nina she would not want to testify against Parker because he was her friend. Marishawn informed Nina that she was too afraid to testify against Parker.

At trial during cross-examination, Nina testified that Wynn sold crack in the parking lot. She also testified that before the police arrived, while in the parking lot, Nina told Marishawn what she

had seen. Nina denied that she had told a policeman that Kizzy Kenner was outside and saw the incident. Nina also denied telling the officer that the shooter turned as if to walk away and then turned back around to fire. On redirect, Nina testified that she saw Parker's back during the shooting and observed his face when Parker turned to run.

Marishawn Walker's testimony differed as to the details of the shooting. Marishawn testified that she had dated Parker when she lived with Kizzy. When she moved in with Nina, Marishawn began to date Wynn. She testified this did not cause hard feelings between Parker and Wynn. She also testified that Wynn wore his long black leather coat, black pants, and a dark shirt the night before the murder. At the party that night, Wynn, when taunted about the $10 Parker owed him, went upstairs for the gun he kept in the bedroom.

Marishawn stated that the next day when they awakened, Wynn left to get something to eat. Marishawn said that while she was talking on the phone, Nina, who was looking out the door into the parking lot, said that Wynn was being robbed. Marishawn looked out and observed Parker yelling in Wynn's face. Marishawn returned to the phone, stated that Wynn was being shot, then ran outside and saw Wynn lying on his stomach. She observed Parker shoot Wynn once more. She believed it was Parker because the person was wearing the same clothes Parker had worn the night before. Marishawn had heard three or four shots and observed the final shot. She ran to Wynn, but did not know if he was alive. She observed Kizzy push her children back into her apartment before running to Wynn.

On cross-examination, Marishawn was questioned about her prior statement to police. Marishawn had stated that Kizzy was outside on her porch when the shooting occurred. Marishawn was then questioned about her statement to police that before Parker fired the last shot, he looked as though he was about to run and then came back and fired again.

At trial, Kizzy Kenner's testimony also differed as to the details of the shooting. She testified that Parker and she greeted each other when they met, but that Parker had never been in her apart-

ment. Kizzy testified that she was home with her children, in the bathroom of her apartment, when Wynn was killed. She admitted that she had been to Nina's to visit hours before the murder.

Kizzy testified that she heard two or three shots, went outside, and saw Wynn lying on the ground on his stomach in the parking lot. She said she then went to Nina's and called the police. She went back to see that Wynn was breathing and then someone called the police again because it took so long for help to arrive. Kizzy denied that she told Nina that Parker might kill Wynn. Kizzy testified that before the shooting Wynn had pulled a gun on Parker at the party.

The coroner testified that there were seven gunshot wounds to the body and six bullets had entered Wynn's body. Five bullets were retrieved. Several of the wounds would have been fatal. Testing indicated that Wynn had previously ingested marijuana.

Daniel Estell was called by the defense. He testified that he was 10 feet from the shooter, who was wearing a mask. Estell stated that Parker did not shoot Wynn. When questioned, he testified that the shooter wore a mask so he could not tell whether it was Parker. Estell said that 3 days after Wynn died, Estell began to date Marishawn. Nina told Estell that Parker was the shooter.

On cross-examination, Estell testified that he was jailed and had previously been convicted for theft. Estell stated that he was in the parking lot selling drugs with Wynn when the shooting occurred. Estell said that he could not describe any physical characteristics of the shooter because he had run away after the first shot. Estell testified that the shooter came out of the back of Kizzy's apartment.

Estell further testified that after Wynn was hit with the gun, Wynn cried out that he had nothing on him. Estell said he saw a silver and black automatic gun. He did not know any details about the race or build of the shooter.

Estell testified he met Parker 1 month before the trial. Estell was forced to admit that he had been housed in the same unit with Parker for a few days when incarcerated. When asked if he had said to anyone that it was Parker who killed Wynn, Estell did not answer the question but instead immediately denied writing the letter. The letter indicated that Estell would testify that he saw

Parker shoot Wynn over $10, in exchange for dismissal of his case. Estell denied writing the letter even though it contained his criminal case number, inmate number, and signature.

An assistant district attorney testified that he had received the letter from Estell offering to testify about the murder and that the letter provided details about the murder.

Finally, a law enforcement officer who had investigated the shooting testified that on the day of the murder Nina reported that the shooter wore a black shirt and tan shorts. Nina was certain at that time that Parker was the shooter. The officer stated that Kizzy had refused to cooperate at the scene.

After all the evidence had been submitted, the jury was instructed that arguments of counsel are not evidence. The jury was also instructed that it was for the jury to determine the weight and credit to be given the testimony of each witness.

During closing argument, the prosecutor stated that Nina and Marishawn had no motivation to lie. The prosecutor characterized the testimony offered by Kizzy and Estell, stating:

"[Prosecutor]: Kizzy Kenner also testified. And remember Nina's testimony about a conversation she had with Kizzy after this homicide happened. That she talked to her about testifying and Kizzy said there is no way she is going to testify against her friend Daniel Parker. She was uncooperative with the police. When Detective Glaspie approached her at the scene minutes after the crime has occurred, she wouldn't give her last name. Says she saw nothing, heard nothing, refused to cooperate at all. And in court today she did admit that she does know him, that she was there, she did hear some things, she did see some things.

"We know that she wasn't telling the truth about not knowing who did this. Because there's been testimony about how well she does know him and that she came over to Nina's that day and commented about [Parker] acting like he's going to kill [Wynn]. And even the defendant's own witness Daniel Estell said that Ms. Kenner is very well-acquainted with [Parker]. They all hung out together.

"The only comment I have about Ms. Kenner's testimony—other than the fact that she probably knows more than she's telling us—is that she probably does have some reason why she's not telling us the whole story. And I don't know that we'll ever know why she is not telling the whole story.

"Daniel Estell also testified. He is absolutely not a credible witness, and I think that was evident from his demeanor on the stand. But, frankly, I don't know whether he was there or not. You notice the state didn't call him as their witness. We could. We didn't call him to the stand. He's not a credible witness. I don't know if he was there or not.

"I do know he has a motive to get up here and fabricate his testimony here today. He wrote a letter that's been admitted to you. Back in March is when he wrote this implicating the defendant. And then he testified today that other people in the jail started hearing that he was turning state's evidence against the defendant. So now he comes in and says 'Oh, I never wrote that and it wasn't the defendant that I saw do it, it was some masked man that did it.'

"Well, I would submit to you the reason he's doing that is he's in jail with the defendant. He doesn't want to be known as a snitch or state's evidence while he's there.

. . . .

". . . He has every reason to come in here and every motive to come in here and fabricate a lie to you.

"And remember he doesn't have a whole lot of detail. He says it was some masked man. Doesn't even remember the clothing that the man wore, but he sure remembers he was a masked man. Did say he came out of Kizzy's apartment.

"Well, remember Kizzy had told Nina that the defendant was with her at some point when he was talking about killing [Wynn]. I don't know if he's partially telling the truth about seeing the defendant come out of Kizzy's apartment and changing it from defendant to masked man or—I don't know what to believe, and I don't think you can know what to believe from Daniel Estell."

During the instruction conference the State asked the trial court to add to the PIK premeditation instruction, Jury Instruction Number 9, the language " 'premeditation' means to have thought over the matter beforehand for any length of time sufficient to form an intent to act." Defense counsel did not object to the additional language. The jury was also instructed on the lesser offenses of intentional and voluntary manslaughter, second-degree murder, and voluntary manslaughter. Parker was convicted of premeditated first-degree murder and sentenced to life in prison.

## Jury Instruction

The trial court instructed that premeditation means "to have thought over the matter beforehand for any length of time sufficient to form an intent to act." This instruction contains language that is not in the pattern instruction, PIK Crim. 3d 56.04(b). Parker did not object to the proposed instruction. Parker now claims that the trial court erred when it instructed the jury that premeditation means "to have thought over the matter beforehand for any length of time sufficient to form an intent to act."

No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection, unless the instruction or the failure to give the instruction is clearly erroneous. K.S.A. 2001 Supp. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Henry,* 263 Kan. 118, 131, 947 P.2d 1020 (1997). Because the defendant failed to object to the instruction given by the trial court, our review must, therefore, be to determinewhether the instruction was clearly erroneous. See *State v. Scott,* 271 Kan. 103, 111, 21 P.3d 516, *cert. denied* 120 S. Ct. 630 (2001).

We have examined the premeditation instruction many times and noted that premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. *State v. Rice,* 261 Kan. 567, 587, 932 P.2d 981 (1997); *State v. Henson,* 221 Kan. 635, 645, 562 P.2d 51 (1977). Premeditation is a "state of mind." *State v. Saleem,* 267 Kan. 100, 105, 977 P.2d 921 (1999). Premeditation and deliberation may be inferred from the established circumstances of the case, provided the inference is a reasonable one. In such case, the jury has the right to make the inference. *State v. Buie,* 223 Kan. 594, 597, 575 P.2d 555 (1978). The evidence of premeditation need not be direct and is often established by circumstantial evidence. *Rice,* 261 Kan. at 586; *State v. Phillips,* 252 Kan. 937, 939, 850 P.2d 877 (1993).

Furthermore, premeditation may be inferred from various other circumstances, including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) the dealing of lethal blows after the deceased was felled and rendered helpless. *Scott,* 271 Kan. at 109; *Henson,* 221 Kan. at 639.

Parker states that there is no evidence of premeditation. He asserts that an argument in the parking lot over money suddenly escalated and resulted in Wynn's death. He claims that there is no

evidence that the lethal shot was fired while Wynn was helpless. We disagree. The State points to evidence that a number of shots were fired after Wynn was helpless on the ground. There was also testimony that Kizzy thought Parker was going to kill Wynn and spoke about her belief to Nina during the hours before the shooting. The shooter deliberately knocked Wynn to the ground before shooting. As the prosecution noted to the jury, the shooter chased Wynn around the vehicle before knocking him to the ground and then opening fire. Two witnesses testified that the shots were fired after the victim was on the ground and that the final shot was fired while Wynn lay on his stomach.

Although Parker asserts that, had the jury been correctly instructed, there would have been a conviction on one of the lesser included offenses, he offers no support for this argument. There was evidence of premeditation. Although it is unfortunate that the instruction given might, in some instances, cause jurors to focus on a temporal component of premeditation, *i.e.*, a concern related with or related to time, rather than on the state of mind of the accused, it is unlikely that any error in the instruction led to jury confusion. The instruction was not clearly erroneous.

## Prosecutor's Misconduct

Parker argues that the prosecutor's statement to the jury questioning the credibility of the witnesses was of such magnitude that it denied him his constitutional right to a fair trial. Parker contends that because the case hinged on witness testimony, it was error for the prosecutor to offer a personal opinion on the credibility of the witnesses. He asserts that the prosecutor's comments attacking the credibility of Kizzy and Estell were critical because those witnesses had cast doubt about the identification of Parker as the shooter and changed the result of the trial.

The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is

consistent with the evidence. Second, we must decide whether the remarks constitute plain error, that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial, requiring reversal. *State v. Pabst*, 268 Kan. 501, 505, 996 P.2d 321 (2000); *State v. Lumley*, 266 Kan. 939, Syl. ¶ 12, 976 P.2d 486 (1999).

Kizzy's testimony was inconsistent with her prior statements and the testimony of the others. The most important distinction is that, at trial, Kizzy denied telling Nina that Parker was about to kill Wynn. However, Kizzy's testimony, although inconsistent with the testimony of the others, does not, as Parker argues here, directly or indirectly cast doubt about the identity of Parker as the shooter.

Estell's testimony was less than credible. Estell was the only witness to testify that the shooter wore a mask. Even if the shooter wore a mask, Estell did not eliminate Parker as the shooter. Estell testified he could not tell the identity of the shooter because of the mask. Estell's testimony was also impeached a number of times.

Kizzy and Estell were clearly inconsistent during their testimony and their testimony was also inconsistent with the testimony of other witnesses. Although the other witnesses also did not offer identical testimony about the events of the day, their testimony was consistent about the identity of Parker as the shooter. Parker's only defense was to call into question the identification of the murderer.

The State incorrectly argues that there was no expression of the prosecutor's personal opinion during closing and that the prosecutor's comments merely highlighted the fact that these witnesses were not credible. The prosecutor's statements to the jury were comments on the credibility of the witnesses, and the prosecutor surmised to the jury about the motivations of the witnesses. The prosecutor concluded in her closing argument that she did not believe the witnesses, and therefore, the jury should not believe the witnesses. The State incorrectly argues that the comments were fair.

However, there was sufficient evidence of premeditation and it was unlikely the jury was confused by the instructions or influenced by the prosecutor's improper closing argument. The prosecutor's

comments on the credibility of the two witnesses did not change the result of the trial.

Affirmed.

DAVIS, J., not participating.

BRAZIL, S.J., assigned█